### In re NATIONAL GYPSUM COMPANY, Aancor Holdings, Inc., Debtors.

Nos. 390–37213–SAF–11, 390–37214–SAF–11.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Oct. 30, 2000.

---

See also 219 F.3d 478.

Michael A. Rosenthal, Gibson, Dunn & Crutcher, Dallas, TX, for NGC Settlement Trust and The Asbestos Claims Management Corporation.

Sander L. Esserman, Stutzman & Bromberg, Dallas, TX, Successor Legal Representative, for Unknown Asbestos Disease claimants.

Garland S. Cassada, Robinson, Bradshaw & Hinson, Charlotte, NC, for New National Gypsum Co.

Mark F. Rosenberg, Sullivan & Cromwell, New York City, for New National Gypsum Co.

Judith Elkin, Haynes & Boone, Dallas, TX, for New National Gypsum Co.

Mark H. Iola, Stanley, Mandel & Iola, Dallas, TX, for Bodily Injury Trust Advisory Committee (BI TAC).

Russell Budd, Baron & Budd, Dallas, TX, for Bodily Injury Trust Advisory Committee (BI TAC).

William Sheehan, Shea & Gardner, Washington, D.C., for the Center for Claims Resolution.

Michael P. Cascino, Cascino Vaughan Law Offices, Ltd., Chicago, IL, for Unpaid claimants Winnifred Schiller, et al.

Martin Dies, Dies, Henderson & Carona, Orange, TX, for Property Damages Trust Advisory Committee (PD TAC).

Jonathan W. Miller, Greitzer & Locks, Philadelphia, PA, for claimants Jack Biddle, Sylvestor Capozzi, et al.

## MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Bankruptcy Judge.

By this memorandum opinion, the court establishes the Alternate Asbestos Disease Claims Resolution Facility mandated by the First Amended and Restated Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code for National Gypsum Company and Aancor Holdings, Inc., as modified, and the Order Confirming the First Amended and Restated Joint Plan of Reorganization of National Gypsum Company (NGC) and Aancor Holdings, Inc.

### Background

By order entered March 9, 1993, the court confirmed the first amended joint plan of NGC and Aancor Holdings, as modified. Among other features, the plan created New National Gypsum Company to own and operate National Gypsum Company's wallboard business. Plan, § 5.3(a), (b). The debtor corporate entity became Reorganized National Gypsum Company, subsequently changing its name to Asbestos Claims Management Corporation (ACMC). The plan created the NGC Asbestos Settlement Fund, now the NGC Settlement Trust. Plan, § 5.1(a), (b); Confirmation Order entered March 9, 1993, § 9. Asbestos property damage creditors settled with the company under the terms of the plan. Persons exposed to National Gypsum asbestos-containing products became beneficiaries of the trust. The plan charged the trust to resolve asbestos disease claims deriving from that exposure, both for those persons holding cognizable claims under non-bankruptcy law as of the confirmation of the plan and for those unknown and future persons who may suffer claims. Plan, § 5.1(a), (b); Confirmation Order § 9.

By order entered April 14, 1992, the court appointed a Legal Representative to advocate the interests of the unknown and future asbestos disease claimants.[1] The Legal Representative has a consultative role with the trust and has standing to be heard before this court as a party in interest. Plan, §§ 1.105, 5.1(m)(2), 11.11; Findings of Fact and Conclusions of Law by Bench Ruling, January 29, 1993, p. 40. In addition, the plan created a bodily injury trust advisory committee (BI TAC) consisting of lawyers representing known asbestos disease claimants to consult with the trust. Plan § 5.1(o); Confirmation Order, § 9(h).

To fulfill its function, the court charged the trust to "treat all its beneficiaries similarly and fairly. The trust must similarly pay the claims of all persons exposed to asbestos from NGC asbestos-containing products." Bench Ruling, p. 10. With trustee discretion and court supervision, the court envisioned that the trust would "likely be able to fulfill its mandate to similarly pay similarly-situated claimants." Bench Ruling, p. 37.

The court recognized that asbestos disease claimants having cognizable injuries under non-bankruptcy law as of confirma-

---

1. The court appointed Daniel M. Phillips as the Legal Representative. Phillips died on August 22, 2000. By order entered August 31, 2000, the court appointed Sander L. Esserman the successor Legal Representative, on an interim basis.

tion held claims under the Bankruptcy Code, 11 U.S.C. § 101(5), which would be paid by the trust and discharged. The court permanently enjoined them from bringing claims against New NGC. Confirmation Order, §§ 9(a), 10(a). But persons exposed to National Gypsum asbestos-containing products who did not have cognizable claims as of confirmation under non-bankruptcy law and future claimants did not hold claims under the Bankruptcy Code. As a result, the court concluded that "[n]on-Bankruptcy Code claimants must be able to pursue their remedies in the future after the exhaustion of the trust." Bench Ruling, p. 33. After channeling those persons to the trust, the court limited Reorganized NGC's liabilities to them to the trust and provided "New NGC shall not be subject to the commencement or continuation of litigation by any person on or on account of [unknown and future] claims pending exhaustion of the remedy or remedies provided by the [trust]." Confirmation Order, §§ 9(b), 10(b)(1) and (2). In effect, the court imposed a temporary injunction on channeled unknown and future claimants.

To confirm the plan over the objections of certain creditors, the court found that New NGC would have an enterprise value of $350 million on the effective date of the plan, with the asbestos-related litigation protection provided by the plan and the confirmation order. Findings of Fact, filed March 9, 1993, no. 33. Consequently, the treatment of channeled claims by the trust and the channeling injunction regarding litigation against New NGC had been structured to insure that the trust would treat similarly situated claimants similarly and that New NGC would have an enterprise value of $350 million on the effective date of the plan. Confirmation Order, § 9(g)(2)(i) and (ii).

With regard to the satisfaction of asbestos disease claims caused by exposure to National Gypsum asbestos-containing products, the plan established the "Asbestos Disease Claims Resolution Facility" and designated the Center for Claims Resolution (Center) as that facility. Plan, § 5.1(m)(2); Confirmation Order, § 9(g)(1). NGC had been a member of the Center. ACMC assumed that membership. The plan authorized the trust to terminate ACMC's membership in the Center. Plan, § 5.1(m)(2). By notice dated June 20, 2000, the trust terminated ACMC's membership in the Center effective June 16, 2000.

Upon termination of ACMC membership in the Center, the plan provides that the "Alternate Asbestos Disease Claims Resolution Facility" becomes the "Asbestos Disease Claims Resolution Facility." Plan, § 5.1(m)(2). The alternate facility must seek to resolve asbestos disease claims consistent with the plan, the trust documents and certain designated asbestos disease claims resolution procedures adopted as exhibit A to the plan. Plan, §§ 1.13, 1.18, 1.40 and 1.127.

In outline format, the plan procedures provide:

I. Asbestos disease claimants must receive similar treatment.

 A. Claimants may choose between an expedited review and payment procedure and an individualized review and payment procedure, subject to reserves or reductions necessary to ensure substantially equivalent treatment of all classes of claimants.

 1. Each claimant must receive the same percentage of his claim as evaluated subject to the expedited review and claim payment procedure. Each claimant must receive substantially equivalent amounts under the individualized review and payment procedure.

 a. Expedited review and claim payment: If the trustees set up an expedited cash payment option, claimants may come to a full and final settlement with the trust in exchange for a sin-

gle cash payment in an amount determined by the trustees.

1. The trustees may establish different payment amounts for various categories of claims or asbestos disease not exceeding $1,000.

2. A valid claimant with a non-malignant asbestos disease condition who elects to have an expedited cash payment may file a new claim for an asbestos-related malignancy that is subsequently diagnosed. Any additional payments shall be reduced by the amount of the expedited cash payment.

b. Individualized review and payment: An asbestos disease claimant who elects individualized review shall receive payment for valid claims based upon a detailed examination of exposure, loss, injury and other factors determinative of claim value.

1. The trust may require the submission of x-rays, laboratory tests, medical examinations or reviews and other medical evidence to support claims and require that the medical evidence comply with recognized medical standards regarding equipment, testing methods and procedures to assure that the evidence is reliable.

2. The trust will categorize claims by disease and occupation within each disease category.

i. The categories and values for each disease shall be determined by relevant variables under applicable tort law.

ii. For each category or subcategory, the trust shall determine a limited range of liquidated values to maintain average historical payments of NGC to resolve similar claims.

iii. The trustees shall determine, based upon data from the Center and other appropriate information, the nature of the cases that they will classify as extraordinary cases.

1. Extraordinary cases are: (1) cases where NGC asbestos-containing products constituted a substantial percentage of the claimant's asbestos exposure; or (2) where a claimant's damages are exceptionally larger than the normal range of values for diseases.

2. Extraordinary claims may be valued for amounts that exceed the limited range of liquidated value for any given disease category.

c. The trustees shall determine the most appropriate procedures for making payments and shall audit, monitor, and verify claims in order to ensure that payments are made only for valid claims.

1. The trustees shall draft appropriate forms and instructions for all asbestos disease claimants under either payment selection consistent with the asbestos disease claimants materials.

2. All forms shall indicate that they are submitted to the trust with a declaration of their accuracy under penalty for presentation of a fraudulent claim in accordance with 18 U.S.C. § 152.

2. Order of consideration of claims:

a. Claimants who elect expedited review shall have their claims processed by the trust in chronological order of receipt based upon the date on which the trust has received all documentation necessary to process the claim.

b. Claimants who elect individualized review shall have their claims processed in chronological order based upon the date on which the trust has received all documentation necessary to process the claims.

c. In order to reduce transaction costs, the trustees may process, liquidate, and pay asbestos disease claims in groups of claims or otherwise no matter what the order of individual claims.

1. The trustees shall define claims involving extreme and undue hardship so that they may be considered separately.

2. In the event that the trustees determine it advisable primarily, but not exclusively, in order to reduce transaction costs, the trustees may suspend their normal order of consideration in favor of claimants who select expedited review and payment.

B. In order to assure substantially equivalent treatment of all claimants, the trust may decide to have different forms and timing of payments to different claimants.

1. Such decisions must be based on estimates and therefore may have to be revised in the light of experience over time.

a. Therefore, a claimant who receives payment early in the life of the trust may receive a smaller or larger percentage of the value of his claim than a claimant who receives payment in the middle of or late in the life of the trust.

C. To ensure substantially equivalent treatment of all present and future claimants, the trustees must determine prior to making any distributions the percentage of full liquidated value that claimants would be likely to receive.

1. No claimant shall receive payments that exceed the trust's most recent determination of the percentage of the full liquidated value that all other claimants would be likely to receive.

a. The trustees must base this determination on estimates of the number, types, and values of present and future claims and the timing and amount of payments under NGC's insurance contracts, the trust's expected future expenses for administration and legal defense and other material matters that are reasonable and likely to leave sufficient funds to pay a comparable percentage of full value to all present and future claims.

b. From time to time, the trustees will reconsider this determination to assure that it is based on accurate, current information.

c. When making this determination, the trustees will exercise common sense and a flexible evaluation of all relevant factors. Trustees shall not act in a rigid, restrictive manner based only on worst case scenarios.

II. All asbestos disease claims must be reviewed to ensure that each claim presents evidence of diagnosis of an asbestos-related condition resulting from exposure to NGC asbestos-containing products, which evidence would sustain a cause of action at law.

A. The trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid claims so that the payment of valid claims is not further impaired by the process.

B. In issues related to the validity of claims, e.g. exposure and medical evidence, the trustees shall have the latitude to make judgments regarding the amount of transaction costs to be expended so that asbestos disease claims that are clearly valid

are not further impaired by the costs of additional investigation.

1. However, the trustees retain the discretion to contest the validity of any claim notwithstanding the costs thereof.

2. Subject to the approval of the bankruptcy court, the trustees may amend the criteria from time to time to conform to generally suggested changes or advances in scientific or medical knowledge or other changes in circumstances.

C. The trustees shall conduct random or other audits to verify information submitted in connection with either payment selection alternative in accordance with these procedures.

1. In the event that an audit reveals that invalid information has been provided to the trust, the trust may penalize any claimant or claimant's attorney by disallowing the claim or seeking sanctions from the U.S. District Court in which the bankruptcy was filed, including but not limited to, requiring the offending source to pay the costs associated with the audit and any future audit or audits, reordering the priority of payments of claims, raising the level of scrutiny of additional information submitted from the same source or sources, or prosecuting the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152.

2. The trust may develop methods for auditing the reliability of medical evidence, including independent reading of x-rays.

3. If its audits show an unacceptable level of reliability for medical evidence submitted by specific doctors or medical facilities, the trust may refuse to accept medical evidence from such doctors or facilities.

III. Alternative Dispute Resolution; Jury Trial.

A. Settlements shall be favored over all other forms of claim resolution, and the lowest feasible transaction costs shall be incurred in order to conserve resources and ensure funds to pay all valid claims.

B. The trustees shall establish an appropriate alternative dispute resolution process so that the claimants and the trust shall have a full range of alternate dispute resolution devices available for their use, including mediation and arbitration.

1. If compensation of an alternative dispute resolution provider becomes necessary, each side shall bear its own costs.

C. In the event that there is no settlement between the trust and a claimant pursuant to individualized review, the claimant may initiate mediation, non-binding arbitration or binding arbitration in accordance with the procedures set up by the trustees.

1. Arbitrators will return awards within the range of disease category value limits set by the trust for the disease category in which the claim properly falls, determine that the disease falls in a higher or lower category and determine an appropriate value, or, in extraordinary cases, return awards in excess of category limits.

2. If a claimant submits to arbitration and accepts the award, the award will establish the liquidated value of the claim, and the claimant will receive payments in the same manner as one who had accepted the original valuation of the claim by the trust.

D. In determining the value of any claim, punitive damages shall not be considered or allowed, notwithstanding their availability in the tort system.

E. The trust shall not pay any pre-judgment interest, post-judgment interest, interest on deferred payments, or any other type of interest on an asbestos disease claim.

F. A claimant's right to a jury trial shall be maintained for the purpose of liquidating his claim.

1. Only claimants who opt for non-binding arbitration and then reject their arbitration awards retain the right to a jury trial of the liquidated value of their claims against the trust.

 a. A claimant who rejects the settlement offer of the trust and an award in non-binding arbitration, and who elects to resort to the tort system and obtains a judgment for money damages shall have a claim with a liquidated value equal to the judgment.

 b. Judgment creditors with verdicts in excess of the highest range of values for certain diseases will be paid the applicable percentage of the amount of the highest range of their disease category.

 1. The applicable percentage of the excess of the judgment above this amount shall be paid no sooner than 5 years after the date the judgment is entered in the trial court, unless the trustees determine that such payment will adversely affect payment to other claimants, in which event payment of the applicable percentage of the excess of the judgment shall be made in 5 equal annual installments beginning 5 years after the date the judgment is entered.

2. Any lawsuit pending against the trust at the time that the trust ceases participation in the Center shall be stayed until the rejection of an arbitration award. Other claimants desiring to file suit against the trust may do so only after the rejection of an arbitration award.

3. If a trial is sought:

 a. the statute of limitations will be tolled as of the date the claim was filed, and the right to a jury trial shall be preserved with the defendant being the "NGC Asbestos Disease and Property Damage Settlement Trust."

 b. Venue shall not be changed by the bankruptcy case.

 c. The law to be applied shall be either (1) the law of the state where the claimant has previously filed an asbestos disease lawsuit or, (2) in the event no prior lawsuit has been filed, the law of the state with jurisdiction over the lawsuit.

 d. All claims and defenses which exist under the applicable law shall be available to both sides at trial.

 1. The trust may waive any defense that would purport to establish that NGC was not liable for asbestos-related diseases caused by its asbestos-containing products.

 2. The trust may concede product defect and that the product defect caused any asbestos-related injury. In that case, the claimant will be precluded from introducing any additional evidence on the product defect issue.

 e. The award of an arbitrator or the recommendation of a mediator and the positions and admissions of the parties during compliance with alternative dispute resolution procedures shall not be admissible for any purpose at trial by any party or third

party and are expressly determined not to be admissions by either party.

 f. If necessary, the trustees may obtain an order from the U.S. District Court for the district in which the bankruptcy was filed incorporating an offer of judgment to liquidate the amount of the claim, scheduling discovery and trials in such a fashion as not to create an undue burden on the trust, or containing any other provisions, in order to ensure that the trust fulfills its obligations.

IV. Notice and claimant payment selection: For claims made after the effective date of the alternate facility, the trust shall mail claim materials to claimants within a reasonable time after receipt of the claim.

 A. Any claimant who fails to return an appropriate, completed claim information and payment selection form, which will be included in the claim materials, within 12 months from the date of mailing shall have his claim disallowed unless the claimant is able to demonstrate to the satisfaction of the trustees that the failure should be excused.

V. Release: The trustees shall determine the form and nature of the releases in order to maximize recovery for the claimants who present evidence of diagnosis of an asbestos-related condition resulting from exposure to NGC asbestos-containing products without increasing the risk of claims for indemnification or contribution from the trust.

 A. As a condition to making any payment to a claimant, the trust shall obtain a general, partial, or limited release as appropriate in accordance with applicable state or other law, consistent with the payment selection by the claimant.

 1. If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant shall constitute such a release.

 B. The claimant shall execute any documents necessary for the trust to perfect its claim against NGC's insurers to receive indemnity for payments, to release any claim the claimant may have against the insurer, and to receive and keep any and all payments made by the insurer for payment of the claim.

Beyond these procedures, the plan recognized that the court may amend and modify the requirements of the plan and adopt additional settlement guidelines, as necessary. Plan, § 5.1(m)(2). The court, in the confirmation order and pursuant to § 5.1(m)(2) of the plan, directed that if the trustees did not adopt an alternate facility, the court would do so. Even if the trustees adopted a facility, the court could adopt additional claims settlement procedures. Confirmation Order, § 9(g)(1). Court authority to adopt a facility assured "that the purpose of the [trust] is accomplished and the asbestos-related litigation protection for New NGC which is necessary to assure that New NGC has an enterprise value of $350 million on the effective date [of the plan] . . . is provided." Confirmation Order, § 9(g)(2)(i). The court may consider, among other matters:

the settlement procedures set forth in the Class Action Settlement [*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (Georgine)], including such factors as: *(aa)* sufficient evidence of exposure to NGC asbestos or asbestos-containing products; *(bb)* establishment of compensable medical categories of asbestos-related diseases; *(cc)* compensation levels for various asbestos-related diseases based on medical criteria; *(dd)* compensation levels for asbestos-related diseases that do not meet the medical crite-

ria but would be compensable under the applicable tort law; *(ee)* claims submission and payment procedures, including submission of claims without assistance of counsel; *(ff)* procedures for the payment of extraordinary Asbestos Disease Claims; *(gg)* limitations on jury trials and the use of alternate dispute resolution procedures to resolve Asbestos Disease Claims; and *(hh)* limitations on the recovery of attorneys' fees in connection with the representation of persons asserting Asbestos Disease Claims against the NGC Asbestos Settlement Fund. The Court may also impose a percentage payment schedule.

Confirmation Order, § 9(g)(2)(ii).

In its Bench Ruling, the court explained: If the trustees select the alternative facility, the trustees must develop additional settlement criteria after considering the anticipated remaining and projected claims and the available assets. If the trustees cannot establish additional criteria or obtain the bodily injury TAC approval, the court will establish the criteria. The court may use the proposed global settlement as a model to complete the additional criteria for the alternative facility. The court will consider the following: Medical criteria. Exceptional circumstances. If a person does not meet the medical criteria or exceptional circumstances, proof that the claimant has an injury compensable in the appropriate jurisdiction and set the minimum payment schedule. Range of values by disease and occupation, using 10.2 percent of the global settlement ranges. Attorneys' fee limitations. Procedures for submitting claims without assistance of counsel. Annual claims payments based on 67,000 claims for the first ten years. With these or similar provisions, plus the provisions in the plan, and using Dr. Peterson's analysis for the use of assets over time, the trust's beneficiaries should be treated similarly and fairly. If the trustees decide to terminate the CCR participation and use the alternative facility, the court will set a period of time for the trustees to develop the necessary criteria to assure that the facility can be used to fulfill the trust's mandate or the court will do so.

Bench Ruling, pp. 25–26.

## Alternate Facility Hearing Procedure

On June 20, 2000, the trust terminated ACMC's membership in the Center, effective June 16, 2000, triggering the plan and confirmation order requirements to implement the alternate facility. Pursuant to the plan and confirmation order, the court scheduled hearings to consider an alternate facility to be submitted by the trust and any proposed additional settlement procedures. On July 28, 2000, the trust filed its amended preliminary alternate facility proposals. Also on July 28, 2000, New NGC filed amended proposed additional claims settlement procedures. On August 17, 2000, the trust responded to New NGC's proposals and New NGC responded to the trust's proposals. Also, on August 17, 2000, the Legal Representative responded to the proposals. By letter dated September 15, 2000, the trust informed the court that the trust and New NGC scheduled conferences to narrow the differences in their proposals. On September 18, 2000, the trust, New NGC and the Legal Representative submitted to the court an agreed alternate facility, with several reserved areas of disagreement.

Meanwhile, on July 11, 2000, several asbestos disease claimants filed a motion to cancel hearings on an alternate facility and to terminate the channeling order. Those claimants contend that circumstances no longer warrant continued imposition of the channeling of claims and the corresponding temporary injunction. On August 18, 2000, New NGC responded to that motion.

On June 22, 2000, the Legal Representative moved to terminate the channeling order. The Legal Representative contends that absent funding of the alternate

facility by New NGC, the claimants should be deemed to have exhausted their trust remedies.

The court conducted evidentiary hearings on the alternate facility and these related motions on September 18, 19, 20, 21, 26, 27 and October 17 and 18, 2000. The parties agreed that the same evidentiary record would apply to the motion to cancel the hearings on the alternate facility, the motion to terminate the channeling order and the alternate facility. The court began hearings by first considering evidence on the trust's and ACMC's assets and liabilities, including the projected number of asbestos disease claims over the next 40 years and the value of those claims. The court then expanded the hearings to cover the full range of considerations required by the plan procedures outlined above. The court requested evidence of several factors based on issues raised by the parties. The court balanced the need for the parties to present and consider that evidence with the pre-hearing scheduling requirements.

■ The establishment of the alternate facility and the management of the channeling order and corresponding temporary injunction present core matters over which this court has jurisdiction to enter a final judgment or order. 28 U.S.C. §§ 157(b)(2)(O) and 1334. This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rules 7052 and 9014.

### Alternate Facility Purpose

In establishing the alternate facility with additional settlement procedures the court must "insure that the purpose of the [trust] is accomplished and the asbestos-related litigation protection for New NGC which is necessary to assure that New NGC has an enterprise value of $350 million on the effective date [of the plan] . . . is provided." Confirmation Order, § 9(g)(2)(i). The plan had an effective date of July 1, 1993. The parties stipulate that New NGC had an enterprise value of at least $350 million on that day. Accordingly, New NGC realized the $350 million enterprise value on the effective date of the plan. The purpose of the asbestos-related litigation protection for New NGC has been accomplished.[2]

The remaining and not yet accomplished purpose of the alternate facility and additional settlement procedures is to insure that the trust accomplishes its function. The trust must settle the claims of similarly situated claimants similarly. Since confirmation, the trust has settled claims using the Center. The Center operates in the tort system. The trust has settled approximately 235,000 . claims using that process. At confirmation, the court estimated that approximately 62,000 persons had cognizable asbestos disease claims under non-bankruptcy law that came within the definition of a claim under the Bankruptcy Code. Findings of fact, filed March 9, 1993, no. 41(a). Virtually all of those claims have been resolved. The court proceeds, therefore, with the presumption that the trust's remaining asbestos disease claim beneficiaries do not hold Bankruptcy Code claims under the plan and have not

2. In a memorandum opinion and order entered September 29, 2000, staying pending appeal this court's order terminating the channeling order for several claimants after ACMC terminated its Center membership and before these hearings, the United States District Court found that "New–NGC will be subjected to litigation that it clearly did not bargain for when the Plan was consummated[.]" *In re National Gypsum Co.*, No. 00–CV–1729, slip op. at 18 (N.D.Tex. Sept. 29, 2000). The creditors of NGC bargained for the plan, but did not reach complete agreements. As discussed above, the court therefore held a contested confirmation hearing. The plan, as confirmed by the court, created New NGC, with a plan effective date value of $350 million with the asbestos litigation protections. The trade and bond creditors of NGC became the owners of New NGC on the effective date. They obtained precisely what the plan required. The asbestos disease litigation protection provided an effective date value that permitted confirmation of the plan under 11 U.S.C. § 1129. That "bargain" has been realized.

been discharged. The court applies this presumption for analytical purposes only and without prejudice to any party asserting in litigation that a particular claim has been discharged.

In addition to resolving discharged claims in the tort system, the trust has resolved a significant number of non-discharged claims in the tort system as well. At confirmation, the court estimated that unknown and future claims would total 150,000 to 165,000. Findings, filed March 9, 1993, no. 41(b). Unfortunately, subsequent events have established that the court underestimated that number.[3] Regardless, however, of the number, until termination of the ACMC membership in the Center, the trust has resolved those claims in the tort system.

In a declaratory judgment action, this court found that the plan, as confirmed by this court, implicitly imposed liability on New NGC for non-discharged asbestos disease claims for persons exposed to National Gypsum asbestos-containing products upon the exhaustion of the trust remedies. *NGC Settlement Trust v. National Gypsum Co.*, No. 98–3309, Bench Ruling (Bankr.N.D.Tex. February 27, 1998). With that liability, upon exhaustion of the trust's remedies, unresolved claimants would have a tort system remedy, which is precisely what they had but for the NGC bankruptcy case. By definition, the process therefore assured that all similarly-situated trust beneficiaries would be treated similarly—each would have claims resolved in the tort system, with a liable entity in the tort system. That assurance no longer exists. The United States Court of Appeals for the Fifth Circuit reversed the declaratory judgment, holding that the plan allows only the possibility of successor liability for New NGC, but not plan-

3. The court recognizes that evidence at the confirmation hearing had been introduced that the number would be higher. But, then again, other evidence suggested that the court had overestimated the claims. Meanwhile, the court takes note of improved diagnostic techniques and more efficient communications. Also, the court recognizes the testimony at hearings in 1998 explaining, in part, the difficulty in estimating future claims. That testimony revealed that 25,000,000 Americans had been exposed to asbestos-containing products by several entities. Of that number, 12,000,000 were then still alive. As a court that has struggled with the personal health and economic problems associated with asbestos exposure, the court remains troubled that Congress has failed to address a matter to which fully 10 percent of the population of the United States had been exposed.

In its arguments that claimants must individually exhaust trust remedies before the court may consider terminating the channeling order, New NGC reminds the court that it found, at confirmation, that "[t]he potential for litigation against New NGC is so remote in time and minimal in amount as to have no effect on its present value [the plan effective date under § 1129] nor on its likelihood for success." Bench ruling, p. 28. As found above, New NGC had achieved its effective date value. Counsel for the trust suggested that after the effective date New NGC's value virtually tripled. *See, e.g.,* "Large Profit for Maker of Wallboard," *New York Times* (Feb. 15, 1995). Beyond that, the court makes several additional observations concerning that argument. First, the analysis of value had been made by the court only in the context of 11 U.S.C. § 1129. Second, the market for New NGC's stock would have been cognizant of the court's ruling that New NGC would not enjoy the protection of a permanent injunction. The market would make its own risk assessment of asbestos exposure, societal and medical factors, business opportunities and litigation, considering but not banking on the court's confirmation findings. Third, as the court found, trust assets have been sufficient to resolve in the tort system the projected number of claims made by the court. As noted in this footnote, unfortunately for all concerned, the claims are now projected at far in excess of the 235,000 claims resolved by the trust. Fourth, had the Georgine settlement been approved by the Supreme Court, these hearings would not be taking place now. This court noted at confirmation that approval of Georgine was not a matter for this court. Fifth, as the Legal Representative observes in his argument that the channeling order has served its purpose for New NGC, circumstances have changed. The plan provided that the court had authority to amend and modify the plan procedures for trust remedies for claimants. Plan, § 5.1(m)(2). The market, not this court, bears responsibility for how to factor that authority into investment decisions.

imposed liability. *In re National Gypsum Co.*, 219 F.3d 478, 493 (5th Cir.2000) (petition for rehearing pending). With this change in the law of the case, unresolved claimants must litigate successor liability with New NGC after trust exhaustion state by state. No longer may the court proceed with the assurance of a tort system remedy for the unresolved claimants.

Under the plan procedures outlined above, claimants must receive similar treatment. Claimants paid by the Center facility had been paid in the tort system. They, therefore, by definition, received tort system values. The plan procedures direct that the trust must determine "full liquidated value." Plan, Exhibit A, § VI(A). For similar treatment, that requires an assessment of the tort system values. The alternate facility must therefore employ values that mirror the tort system. The facility cannot replicate the tort system. But the values must mirror the tort system.

The plan procedures and confirmation order recognize that the facility may pay a percentage of that value. A funded facility will pay a percentage that approximates the tort system, thereby fulfilling the trust's function and accomplishing the plan's purpose.

An unfunded facility will be unable to pay more than an extremely small percentage, meaning that claimants cannot obtain from the trust payments anywhere near tort system values. Since the Fifth Circuit mandates that New NGC has no plan liability to them, the only way they can even attempt to obtain tort system values is to have access to New NGC to test successor liability. In other words, for an unfunded facility, the only way to even attempt to accomplish the plan's purpose for the non-discharged asbestos disease claimants will be to declare that the trust cannot resolve their claims and terminate the channeling order.

## Claims and Values

ACMC, the trust, the Legal Representative and New NGC stipulated to the evidence for estimating remaining non-discharged asbestos disease claims over the next 40 years and for estimating the value of those claims in the tort system. For that stipulation, those parties presented projections by Mark Peterson, the trust's consultant on asbestos claims, using data derived from the Center and average settlement values reached by the Center for group settlements. Not all parties in interest appearing at the hearings initially agreed to that stipulation. So the court entertained testimony regarding the projections and the court requested additional evidence.

The Center employed various allocation criteria for resolving claims. These criteria informed both Peterson's projections and the group settlement amounts. The criteria did not necessarily require that a claimant identify National Gypsum asbestos-containing products to obtain a contribution from National Gypsum to a settlement reached between the claimant and the Center. The Center acted as agent for its members and its members determined how to allocate the payment of settlements. If the court estimated future claims based on an ability of the claimant to establish exposure to National Gypsum asbestos-containing products to obtain a recovery, the total number of future claims would be less than the Peterson projections.

However, the Center members weighed and balanced exposure requirements to determine the amount of payment on a settlement by any one member, including National Gypsum. That factors into the average settlements. As a general observation, if the court focused on exposure to National Gypsum asbestos-containing products, the group settlement averages would likely rise. Thus, claims would likely decrease but settlement amounts would likely increase.

In response to the court's request, the parties introduced evidence of the average settlements reached by the Center for trial-listed cases. The Center customarily settled cases as they were listed for trial in the several states, with settlements negotiated about 90 days before the trial date. In addition, the Center embarked at different times and with different groups of plaintiffs' attorneys for large number or group settlements. The average settlement amounts differed for trial-listed and group settlements. The court received evidence for each subgroup of claims and for all claims combined. All took place in the tort system and thus all measure tort system values. From 1998 the group settlements reflect a resolution of litigation concentrated in a few states. In 1998 the majority had been in New York, Texas, West Virginia and Mississippi. In 1999 several other states had a significant concentration, as well. Several claimants criticized the Center and the trust for focusing settlements on cases in those jurisdictions. Regardless of how that concentration of cases may ultimately be critiqued, W.D. Hilton, Jr., the trust's executive director, testified that the settlements reflected actual pressure and developments in the tort system. These states had the largest number of case filings thereby generating tort system pressure for settlements. As such, the group settlements reflect the most current, actual tort system developments. Furthermore, the group settlements often resulted from a negotiation of factors that arguably reflect a wider range of considerations than those that occur with the approach of trial. The average group settlements therefore may better mirror the broad range of factors that produce negotiated settlements in the tort system.

With this evidence, all parties in interest appearing at the hearings ultimately joined in the stipulation. Nevertheless, New NGC suggested that standards for the allowed average settlements to be used by the facility should reflect group settlements from 1995. The court had previously reflected on that time period. The court entertained evidence of average settlement amounts for group cases and trial-listed cases, as well as combined averages, from 1993 until the trust terminated ACMC's membership in the Center. Many factors have impacted settlement averages from 1993, including first the prospect and then the demise of the Georgine settlement, medical diagnostic changes, settlement strategies by the Center and the plaintiffs' bar, bankruptcy cases, and resources available for settlement of claims.

Meanwhile Hilton testified that it could take up to a year before the alternate facility became fully operative. Letitia Chambers, New NGC's expert on claim facilities, testified that the facility may not begin paying claims until 2002. Using Hilton's start-up time projections, by the time the first batch of claims are filed and processed, settlements of a meaningful number of claims would probably not begin until the latter half of 2001 at the earliest. The trust acknowledged that contracting with existing facilities may permit a more expedited start-up process and the trust committed to explore opportunities to enter an administrative arrangement with an existing facility. But even if opportunities for a more expedited implementation emerge, the settlement of claims will not resume for several months after the establishment of the alternate facility.

With the changing factors impacting settlement averages over time and the inevitable delay to processing claims in the alternate facility, settlement averages from 1993 or 1995 are too remote in time to be used for a facility that will not become operative until 2001.

Chambers offered calculations of Georgine settlement values inflated from confirmation to the present. The Georgine settlement values had been negotiated in the tort system in 1993. Using consumer price index inflation rates, the Georgine

values fall considerably short of the tort system values in 1998 to 2000 for either group settlements or trial-listed settlements or both. Consequently, settlement values from 1993 or 1995 do not reflect present tort system values. While the court recognized at confirmation that Georgine settlement values could be considered in determining an alternate facility, the values must mirror the tort system. The Georgine values no longer do so. Thus, to best mirror tort system values as the facility becomes operative, the court will use ACMC's share of the group settlement averages negotiated by the Center and billed to ACMC for payment from January 1, 1998, to August 28, 2000.

The court therefore uses the Peterson projections of future claims through 2039 and ACMC's share of the average group settlements reached and billed by the Center to ACMC from January 1, 1998, to August 28, 2000, for purposes of projecting the number of claims, the value of claims and the allowed liquidated value for payment of claims by the facility, except as otherwise specifically noted in these findings. Peterson projects 415,887 claims with Hilton calculating a settlement cost or value over time of $2,188,899,721 and a present value of $1,138,738,644, using a five percent discount rate. Hilton testified that the trust estimated existing claims from June 16, 2000, not included in the time period of the Peterson projections, of 79,000. The court finds the amounts on exhibit A attached to this memorandum opinion and made a part hereof to be the best measure of the liquidated or settlement values. Exhibit A is trust exhibit 3 admitted into evidence at the hearings.

## Motion to Cancel Alternate Facility Hearing

Lois Ganske, as representative of the heirs and estate of Larry J. Ganske, and Marilyn Moore, as representative of the heirs and estate of Alfred Moore, move the court to cancel the hearings to establish an alternate facility. Drawing on this court's determination that unknown and future claimants could not be discharged and the Fifth Circuit's determination that their claims had to be addressed under non-bankruptcy law, 219 F.3d at 489–90, they contend that the court cannot establish a facility unless it processes claims under the tort system, as did the Center. Alternatively, contending that the trust is insolvent, they maintain that establishing an alternate facility amounts to a futile process, absent funding by New NGC. Since New NGC has made no funding commitment, they contend that the court should suspend the plan requirement of an alternate facility.

The plan requires that an alternate facility be established following ACMC withdrawal as a Center member. Plan, § 5.1(m)(2). Whether New NGC will fund the facility, once established, remains to be determined.

As discussed above, the parties have stipulated that potential claims during the next 40 years may total 415,887, with a settlement cost if continuing under the Center of $2,188,899,721, having a present value of $1,138,738,644. The trust and the Center have an outstanding dispute concerning a reimbursement agreement.[4] Without considering the trust's reimbursement claim against the Center, the trust's assets total approximately $216,161,880, with a fair degree of certainty. *See* hearing exhibit C. If the trust prevails and recovers on its reimbursement claim from the Center, its assets would total approximately $374,713,686. Hilton testified that the trust owes asbestos property damage claimants $32,000,000.

The Center contends that the trust owes approximately $197,836,030, for previously settled claims. Hilton testified that the Center had settled groups of claims before ACMC terminated its Center membership. The Center contends that the trust has a

---

4. *Center for Claims Resolution v. NGC Settlement Trust,* adversary proceeding no. 00–3437 (Bank.N.D.Tex., filed September 6, 2000).

contractual obligation to pay for those settlements. Several claimants appearing at the hearings question whether the obligation is binding and, if so, whether the trust should breach those commitments and decline to pay those settlements. Indeed, those claimants, as well as New NGC, criticize the trust for allowing ACMC to remain a Center member, given the trust's assets and the magnitude of the group settlement negotiations, but those issues are not before the court on the instant contested matters.

At previous hearings on motions to terminate the channeling order, New NGC suggested that the trust use its liquid assets to pay claims rather than fund those settlements. At those hearings, the court assumed that the Center entered binding settlements with the claimants while ACMC remained a Center member. During these hearings, Hilton explained his understanding of the Center's settlement program. Hilton testified that the trust assumed it had liability for Center negotiated settlements made while ACMC had been a Center member. Counsel for several claimants questioned whether Hilton actually reviewed the Center's settlements with claimants to determine whether the settlements constituted binding present obligations or commitments for future negotiations. Hilton testified that the trust employed a reconciliation process with the Center to determine the appropriateness of a particular invoice. Hilton testified that the trust believed that ACMC had a contractual obligation with the Center to pay commitments made by the Center to claimants before ACMC withdrew as a Center member. Hilton suggested that an ACMC petition under the Bankruptcy Code would be needed, in his opinion, to abrogate the obligation. On this record, the court continues to analyze the trust's assets and liabilities on the assumption that the trust and ACMC have a contractual obligation to the Center. In so holding, the court does not determine any of the respective rights and obligations of the Center, ACMC, the trust or the claimants.

Rather, for purposes of these hearings, the court accepts the trust's analysis of ACMC's contractual obligations. Accordingly, if the prior obligations are established and paid, the trust would have $144,877,656 to service the unknown and future claims.

Based on this evidence, over time, the trust most likely could pay only 4.1 to 6.5 percent of those claims, absent additional funding.

Hilton testified that the trust or ACMC could file its own bankruptcy petition. With a bankruptcy petition, ACMC would break its contractual obligations with the Center. The trust would retain its liquid assets committed to fund Center obligations. In turn, settled but unpaid claims would or may be submitted to the trust, increasing its liabilities. Hilton testified under that scenario, without funding, the trust could pay 8 percent of the value of the claims. Analyzed another way, if the Center-negotiated group settlements do not trigger binding obligations on the trust or ACMC, the range of recoveries would increase from 4.1 to 6.5 percent to 8 percent of the value of the claims. The court will address a bankruptcy petition if filed, but does not speculate on that development. Nor does the court speculate on any legal challenge to the Center-negotiated settlements. A swing from 6.5 percent to 8 percent does not result in a significant amount of money to alter how the court weighs the evidence of the most likely scenario for an unfunded facility.

Hilton also testified that if the Center paid no amount under the reimbursement agreement but ACMC was or remained liable for prior Center-negotiated settlements, the trust might not be able to make any payment to future claimants. New NGC recognizes that should this occur, without New NGC funding, claims could not be resolved by the trust and the channeling order would terminate. For this reason, the court does not accord controlling weight to a zero percent scenario,

since the entire facility analysis would be moot.

New NGC presented a scenario where some claimants could receive recoveries of 11.2 percent. Chambers testified that the trust could enter settlements at 11.2 percent of the claims' values if several events occurred. She assumed that the Center-negotiated settlements remained trust and ACMC obligations and that the trust prevailed in its reimbursement dispute with the Center. She also assumed that the trust erroneously viewed its obligations to the asbestos property damage claimants to be $32 million, contending instead that the obligations would be $20 million. She also assumed that the trust would make no payment to unimpaired non-malignant asbestosis and pleural claimants, which would be about 80 percent of the non-malignant claimants in her opinion. The court does not accord that scenario weight.

First, the trust would be required to litigate the asbestos property damage payment with those claimants and win. The court has no evidentiary basis to estimate or project that result. Hilton testified that the trust viewed its obligations to the property damage claimants at $32 million.

Second, the record does not support Chambers' projections of the number of unimpaired non-malignant claimants. Dr. Paul E. Epstein, New NGC's medical expert, testified that based on his clinical practice, 95 percent of his non-malignant asbestosis patients would be impaired. Chambers did not provide the literature she reviewed to make her assumptions. But, regardless, Epstein's actual clinical practice constitutes more persuasive evidence.

Third, the court cannot, consistent with the plan, order no payment to unimpaired non-malignant claimants. *See* Confirmation Order, § 9(g)(2)(ii). While the trust may make relatively small payments to those persons, the trust cannot simply make no payments. Chambers testified that if the trust made no payments to those claimants, substantially more dollars

would be available to pay persons suffering from cancers and other diseases. The evidence supports that opinion. However, the plan mandates that similarly situated claimants receive similar treatment. The claimants in these categories have received recoveries in the tort system and have received payments from the trust to date. As found below, at p. 213, the evidence from New NGC's witnesses establishes that these claimants will incur actual damages for medical tests and diagnostic treatment. Those damages support a facility that would make some payment to those claimants, even if a relatively small one. Chambers also testified that other asbestos claims facilities make no payments to these claimants. However, she identified only the facility created in the plan of reorganization of RayTech Corp. that made no payment. *In re RayTech Corp.*, no. 5–89–00293 (AHWS) (Bankr.D.Conn.), hearing exhibit M. That facility had been established under 11 U.S.C. § 524(g) with circumstances that do not compare to this case and this facility. With § 524(g) protection, that facility necessarily had a substantial degree of claimant support. The court does not proceed in this case under § 524(g). Finally, in support of making no payment to these claimants, Chambers refers to the Georgine settlement. That settlement had been rejected by the Supreme Court.

If the trust made no payment to these claimants, the channeling order would terminate since their claims would not be resolved. Chambers testified that they could be offered continued protection by the tolling of the statute of limitations, as was done in the RayTech facility. The claimants may seek that relief in the several states. But the trust would not resolve their claims and hence the channeling order would terminate.

This court recognized at confirmation, *see* above at pp. 193–94, that the court could consider Georgine-type values for an alternate facility. Using Georgine-type

values, Chambers projected even higher percentage payments. For the reasons stated above at pp. 198–99, the court has rejected Georgine values.

At the close of evidence, New NGC submitted an exhibit titled "New NGC's Exercise of Funding Option." Subject to specified terms and conditions, New NGC represented that it would provide "an additional $100 million in funding to the Trust." New NGC would make ten annual payments of $10 million beginning on December 31, 2002. The $10 million would be reduced by indemnity costs and expenses incurred by New NGC. Payment would be conditioned on the court adopting New NGC's definition of the plan's exhaustion requirements; New NGC accepting the settlement criteria, terms and procedures of the alternate facility; and the court entering an order providing that the funding contribution not be deemed an admission by New NGC of any liability for asbestos disease claims under successor liability or otherwise and that the funding not be admissible as evidence in any proceeding against New NGC.

Of course, a $100 million contribution to the trust over time would increase the recoveries to claimants. But New NGC's exhibit does not constitute a financial contribution to the trust. If New NGC intended to contribute funds to the trust in these proceedings, it would have contributed money or money's worth. New NGC's exhibit does not constitute an enforceable obligation. New NGC's exhibit amounts to, at most, an unenforceable, unperformed promise to furnish support to the trust in the future. For insolvent entities like the trust and ACMC, the court accords that no value. *See, e.g.* 11 U.S.C. § 548(d)(2)(A). New NGC has not contributed money or money's worth.

In addition, the exhibit amounts to no meaningful promise at all. New NGC will deduct from the $10 million annually its indemnity and expenses. New NGC employs a battery of lawyers from three law firms, as well as consultants, to address issues pertaining to asbestos disease claims. Even if New NGC had no other costs than these, New NGC would be contributing less than $10 million per year. If it has successor liability following the termination of the channeling order, the contribution could be considerably less. Since New NGC's exhibit conditions a contribution on New NGC's acceptance of the facility and since New NGC contends the facility should not make payments to unimpaired non-malignant claimants, New NGC should expect the channeling order to terminate for those claimants, thereby increasing the likelihood that New NGC would incur other expenses. Conversely, if the court does not accept the New NGC request to not pay unimpaired non-malignant claimants, New NGC may make no contribution. Either way, the trust has no prospect of actually receiving $10 million per year for ten years based on the New NGC exhibit.

New NGC also conditions the contribution on a trust exhaustion requirement for each claimant. New NGC would require that for an asbestos disease claimant to exhaust trust remedies, the claimant would have to undertake and complete all of the procedures offered by the facility. The claimant would have to submit a claim, engage in the settlement negotiations, submit to mediation or arbitration, and, if unsuccessful in reaching a settlement, proceed to trial against ACMC, obtain a judgment, and then submit the judgment for payment. If, after completing that process, the claimant has not entered into a settlement with the trust, the claimant could request that this court terminate the channeling order. Unless the court construes the plan's exhaustion requirement in that manner, New NGC would not make the contribution.

The court finds below that the trust cannot resolve claims with payments limited to 4.1 to 6.5 percent of tort values. Accordingly, the court holds that the channeling order will terminate if the facility is not funded. Conversely, a facility funded

at the level set by the court below, *see,* p. 221, would pay tort values, thereby obviating the need for the court to determine a binding standard for exhaustion of trust remedies to be applied to all claimants. Between those parameters the court does not opine. The parties, to their credit, have been engaged in out of court negotiations to attempt to reach a global resolution of asbestos disease claims providing New NGC protection pursuant to 11 U.S.C. § 524(g). The court will not be drawn into those negotiations by considering the New NGC exhibit a settlement offer. The court does not adopt the exhaustion of remedies definition advanced by New NGC.

While the court would order that funding by New NGC at the levels found below would not be deemed to be an admission by New NGC of any liability for asbestos disease claims, the court below overrules and does not adopt several other facility criteria, terms and conditions advanced by New NGC. Thus, New NGC will likely determine that the conditions precedent to the contribution have not been met, and make no contribution based on this exhibit.

For all these reasons, the court accords no weight to the exhibit for purposes of assessing the trust's financial resources to settle claims.

The court therefore accords controlling weight to the Hilton projections of assets sufficient to likely pay 4.1 to 6.5 percent of liquidated tort values, without New NGC funding. This finding is without prejudice to the merits of the disputes with the Center. Based on this finding, the court concludes that without additional funding,

the trust could not settle similarly situated claims similarly to the way they have been settled from confirmation until June 16, 2000.[5]

■ Nevertheless, the plan compels that the alternate facility be established. The plan, as modified and as confirmed by court order, amounts to a contract. *See In re Page,* 118 B.R. 456, 460 (Bankr. N.D.Tex.1990). Under the contract, the court must direct the trustees regarding the alternate facility, as outlined above. The court must estimate the cost of operating a facility that complies with the standards discussed above. If New NGC funds that facility, the facility will comply with the plan mandate. If New NGC does not fund the facility, the court must fairly and equitably provide for a distribution of trust assets and address the rights of claimants through the plan provisions for relief from the channeling order. Under either alternative, cancelling the hearing on the alternate facility does not constitute an appropriate remedy.

For these reasons, the motion is denied.

**Motion to Terminate Channeling Order**

The Legal Representative moves to terminate the channeling order. The confirmation order provides that an unknown claimant may pursue non-bankruptcy law rights against any person, including New NGC, "who may be liable to such ... [c]laimant after exhausting the remedy or remedies provided by the [trust]. The ... [c]laimant shall have exhausted the [trust] remedy or remedies and the channeling order shall be terminated as to that ... [c]laimant if the [trust] cannot resolve that

5. In its order entered September 29, 2000, the district court stated that New NGC had a likelihood of success on the merits of appeals of this court's orders terminating the channeling order for claimants after ACMC terminated Center membership but before these hearings. New NGC knew and stipulated to the trust's financial condition on September 18, 2000, 11 days before the district court's order. New NGC knew therefore that the trust would present evidence that if the Center made no reimbursement payment, the trust could make

no payments to unknown and future claimants; if the Center-negotiated settlements constituted contractual obligations, the trust believed its assets could not pay more than 4.1 to 6.5 percent of its liabilities for unknown and future claims; and if the trust did not have to pay the Center-negotiated settlements, the trust assets might allow an 8 percent payment. By September 18, 2000, New NGC also knew that projected trust liabilities would include $2.1 billion of asbestos disease claims.

... [c]laim ...." Confirmation Order, § 10(b)(2).

Prior to July 18, 2000, this court had denied all motions to terminate the channeling order. While recognizing that trust assets may be exhausted in the future, the court declined to terminate the channeling order before that occurred based on the court's declaratory judgment that New NGC has plan-imposed liability for non-discharged asbestos disease claims not paid by the trust. With an operating entity having liability, those persons held the same rights that they held prior to the National Gypsum bankruptcy petition, thereby allowing the court to require that they exhaust their remedies as beneficiaries of a trust before resuming or commencing tort litigation.

On July 18, 2000, the Fifth Circuit issued its decision, holding that the plan did not impose liability on New NGC for asbestos disease claimants, but that any liability would turn on the successor liability laws of the several states. *National Gypsum*, 219 F.3d at 493. Without certain tort liability, this court thereafter granted several motions to terminate the channeling order because all available liquid trust assets had been exhausted or committed to settle known claims. *See* footnote 5.

In this motion, the Legal Representative contends that the rationale of those holdings should be applied to the alternate facility. As found above, without New NGC funding, using values of claims that best mirror the tort system, the trust would most likely settle claims at only 4.1 to 6.5 percent of the tort system mirrored values. The Legal Representative contends that amounts to no settlement at all. For examples, the value of the average mesothelioma claim is $40,629. The unfunded trust would likely pay only $1,666 to $2,641 on that claim. The value of the average lung cancer claim is $6,879. The unfunded trust would likely pay only $282 to $447 on that claim. Several claimants appearing at the hearing, the Center, and the trust agree with that argument.

■ New NGC asserts that the Legal Representative lacks standing to move to terminate the channeling order for all unknown and future claimants across the board. Since the confirmation order provides that "a claimant" may pursue non-bankruptcy law rights after exhausting the remedy or remedies provided by the trust, New NGC argues that each individual claimant must seek relief from the channeling order. The Legal Representative, New NGC contends, lacks standing to pursue that relief on behalf of all unknown claimants. But the Legal Representative maintains, in effect, that the trust cannot resolve claims of unknown and future claimants for pennies on the dollar. The Legal Representative argues that he has standing to assert on behalf of the unknown claimants that for an unfunded facility, the exhaustion process for each claimant would be futile, thereby justifying immediate access to the tort system. In the order entered April 14, 1992, appointing the Legal Representative, the court held that the Legal Representative constituted a party in interest. He has the right to be heard on all contested matters to advocate the interests of the unknown and future asbestos disease claimants. New NGC, a party in interest that has no plan-imposed liability to the unknown and future asbestos disease claimants and no obligation to fund the trust, cannot complain that the Legal Representative lacks standing to advocate the futility of the exhaustion requirement for unknown and future claimants who will most likely receive 4.1 to 6.5 percent of the tort system values for their claims from an unfunded facility. The Legal Representative has standing to advocate that position.

■ As explained above, persons exposed to National Gypsum asbestos-containing products who did not have cognizable claims as of confirmation under non-bankruptcy law and future claimants did not hold claims under the Bankruptcy Code. As a result, their claims ultimately

must be addressed under non-bankruptcy law. *National Gypsum*, 219 F.3d at 489–90. The court applied principles of trust law to make them beneficiaries of a trust. As such, they became entitled to a distribution of trust assets similar to similarly situated claimants. The court then borrowed a principle from administrative law to require that they exhaust the trust remedy or remedies before obtaining access to the non-bankruptcy courts to bring claims against New NGC. Courts have developed a rule of judicial administration that no one could obtain judicial relief for a supposed or threatened injury by an extrajudicial administrative body until the prescribed administrative remedy had been exhausted. *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938) (Brandeis, J.). Although applied to proceedings at law, the principle had been "most frequently applied in equity." *Id.*, at n. 9. Appropriately, then, "[a] litigant may bypass formally outstanding administrative processes, for example, 'when there is no adequate administrative remedy, or when irreparable injury is likely to result absent immediate judicial review.'" *Sweet Life v. Dole*, 876 F.2d 402, 407 (5th Cir.1989) (*citing Lewis v. Reagan*, 660 F.2d 124, 127 (5th Cir.1981)). "[O]nly those remedies which provide a real opportunity for adequate relief need be exhausted. Stated somewhat differently, exhaustion is inapposite and unnecessary when resort to the administrative reviewing body would be futile." *Hodges v. Callaway*, 499 F.2d 417, 420 (5th Cir.1974).

■ The exhaustion of trust remedies provision of the confirmation order must be applied under that analogous equitable standard. If the trust cannot offer an adequate remedy to the asbestos disease claimants, if it does not provide a real opportunity for adequate relief or if resort to the trust by asbestos disease claimants would be futile, then the litigant need not formally exhaust the extra-judicial trust process before obtaining court access by

the termination of the channeling order. The Legal Representative argues, in essence, that for an unfunded facility, continued compulsion to proceed with trust remedies before a claimant may obtain relief from the channeling order is futile. The non-Bankruptcy Code claimants should, as a result, have the channeling order terminated.

New NGC contends that persons exposed to National Gypsum asbestos-containing products must, in the first instance, request recovery from the trust. If the trust has any assets to make a payment to them, New NGC argues that the confirmation order compels that they literally exhaust every conceivable trust remedy.

The facility provides for a negotiated claims process. As discussed below, for individualized claim negotiations, the trust anticipates a 90 day process before the trust would extend a settlement offer to the claimant. If the claimant rejects the offer and the trust and claimant cannot thereafter reach a settlement, the claimant may opt for an alternative dispute resolution process, such as mediation, binding arbitration and non-binding arbitration. If that process does not result in a settlement, the claimant may opt to commence litigation against ACMC. If the claimant obtains a judgment against ACMC, the facility provides for payment of the judgment over time. For a judgment in excess of the claim value established for the facility, payment would not occur for at least five years after the judgment. New NGC argues that a claimant may not seek relief from the channeling order until the claimant exhausts this entire process as trust remedies would be available and the trust would have assets, albeit in amounts capable of paying only 4.1 to 6.5 percent of the claim.

Carried to its extreme, New NGC's position would effectively capture the claimant in a maze from which the claimant could never emerge. Literally, the claimant will not have "exhausted" his trust remedies without applying for the 4.1 to 6.5 percent

payment. Since the trust will likely have sufficient assets to make that payment, the trust remedy will not be exhausted until the claimant rejects a settlement offer in that range at each stage of the process, through negotiations, through mediation or arbitration, through litigation, through judgment, and through the five year waiting period. If the claimant finally breaks down and requests payment at the 4.1 to 6.5 percent in exchange for a release of ACMC and the trust, New NGC contends the claimant still may not request relief from the channeling order.

New NGC asserts that upon receiving a payment from the trust, ACMC must obtain a full release of the claim, thereby releasing ACMC, the trust and New NGC. In effect, New NGC argues the claimant must ultimately or inevitably accept the 4.1 to 6.5 percent solution, and release New NGC, or be denied access to the tort system against New NGC for an inordinant period of time.

New NGC's position is not tenable for an unfunded trust. To compel asbestos disease claimants to a lengthy series of procedures when at any stage the trust cannot offer more than 4.1 to 6.5 percent of tort system values would be to compel them to a futile process, a process that does not provide a real opportunity for adequate relief. The channeling order did not impose a futile process on an asbestos disease claimant. Rather, the process routed the claimant through the trust with the mandate that the trust pay similarly situated claimants similarly. If the trust cannot do so, then it cannot provide a real opportunity for adequate relief and the non-Bankruptcy Code claimant cannot be compelled to proceed through futile hoops before having access to a state's judicial system. To fulfill its mandate, as discussed above, the trust must be able to offer settlements mirroring the tort system. Settlement offers in the range of 4.1 to 6.5 percent of the tort system values do not meet that requirement. Because an unfunded trust cannot fulfill its mandate

for the treatment of all its beneficiaries, the unknown and future asbestos claimants cannot be compelled to proceed through the exhaustion process. The court must conclude that an unfunded trust cannot resolve claims of unknown and future asbestos disease claimants as mandated by the plan. Consequently, pursuant to the plan and confirmation order, the channeling order must be terminated.

If the court adopted New NGC's exhaustion by individual claimant position for an unfunded trust, the court would likely be confronted with the inevitable argument that the claimant will never be able to prove exhaustion of trust remedies, because the trust will always hold sufficient assets to offer the claimant a settlement of 4.1 to 6.5 percent of tort system values. By the sheer weight of the process, New NGC must anticipate that the claimant will finally and ultimately give up his tort system rights and accept the trust's offer. New NGC would then require that the trust obtain a complete release of the claim, including a release of New NGC.

The channeling order would become a permanent injunction, in direct contravention to the plan and confirmation order. In a Catch 22 argument, New NGC asserts the claimant could not obtain relief until he literally exhausted his trust remedies. He could not exhaust his trust remedies if the trust had any funds to make even the most minimal payment, since the trust would be in a position to offer a settlement even five or more years after the entry of a judgment against ACMC. The trust will likely have funds to make about a 4.1 to 6.5 percent payment. Therefore the trust assets will never be exhausted as to a claimant. So the claimant would ultimately have to accept that payment. But that payment cannot be considered adequate relief for the resolution of the claim as mandated by the plan. Nevertheless New NGC would have this court require a release, anyway. The channeling order would then never terminate as to that claimant, or any claimant.

Even though the Fifth Circuit has held that under the plan claimants may pursue successor liability against New NGC in the tort system upon obtaining relief from the channeling order, New NGC now effectively contends that the plan ensnares the claimant into a trap from which he can neither obtain a settlement approaching tort system values nor pursue a tort system claim against New NGC. To the Fifth Circuit, New NGC contends that it may have successor liability for these non-Bankruptcy Code claimants depending on the laws of the several states, but to this court it argues that those claimants are in effect permanently trapped and thereby enjoined from pursuing successor liability.

The court could direct that the trust use the approximately $144,877,656 of assets, *see* p. 31, to settle with asbestos disease claimants on a first come, first served basis. Based on the evidence, that may resolve claims through 2002. The trust would then be completely out of assets. The trust could apply to the court for its dissolution. If granted, the trust would cease to exist and the channeling order would terminate.

If New NGC had plan-imposed liability for the remaining claimants, that might be a viable resolution. With an operating business entity in the market, the remaining claimants would have the same or a similar remedy in the tort system that they would have had but for the NGC bankruptcy case. But with the Fifth Circuit's liability decision, New NGC liability will now turn on the successor liability laws of the several states. As the court analyzed under the alternate facility purpose section, above, that may mean unpaid claimants have no tort system remedy. While this court did not envision that result, the Fifth Circuit's decision is the law of the case.

As a result, this court must formulate trust remedies considering mesothelioma, lung cancer and other asbestos disease claimants who trace their disease and condition to National Gypsum asbestos-containing products. With the uncertainty of successor liability litigation and without New NGC funding, this court must direct the trust to distribute its assets even if only on a 4.1 to 6.5 percent basis similarly to similarly situated claimants, declare that the trust cannot resolve claims at that level and terminate the channeling order.

An alternate facility not funded by New NGC cannot settle with claimants in amounts that mirror the tort system. Those claimants cannot therefore be treated similarly to the otherwise similarly situated claimants whose claims had been settled in the tort system. While an unfunded alternate facility will treat similarly situated claimants similarly in the future, it cannot treat them similarly to the manner claims had been settled before ACMC terminated its membership in the Center. With an unfunded alternate facility paying only pennies on the dollar, the only way for these remaining claimants to be able to regain a measure of that similarity mandated by the plan and confirmation order would be to obtain immediate access to the tort system for claims against New NGC.

The Fifth Circuit held that the plan offered claimants access to the tort system to test successor liability. *National Gypsum*, 219 F.3d at 489–90. That Court teaches that the claimants must have access to the tort system to submit that issue to the state courts. With a trust capable of paying pennies on the dollar and a trust mandate to treat similarly situated claimants similarly which requires a payment that mirrors the tort system, the trust process does not provide a real opportunity for adequate relief and is futile and, consequently, the claimants must be deemed to have exhausted their trust remedies. The assets available for payment are so minimal that the court deems that the trust cannot resolve claims.

Accordingly, if New NGC does not fund the alternate facility as provided below,

the channeling order will terminate as to all remaining claimants.

New NGC offered evidence to suggest that some claimants would accept pennies on the dollar even with a release of New NGC. With 79,000 pending claims and an anticipated 416,000 unknown and future claims, the court has no doubt that out of a half million people, some might indeed do so. But Chambers did not perform a scientific survey of known persons currently asserting claims against the trust to determine who, if any, would settle their claims and release New NGC for pennies on the dollar. Chambers did not interview the pending claimants or their attorneys. Without supporting evidence given weight by this court, the prospects of settlements because of the sheer number of projected claims cannot support a finding that the unfunded facility provides a real opportunity for adequate relief. Chambers testified about other facilities resolving claims for small payments. All those facilities, however, either involve codification of a plan or adoption of a plan under 11 U.S.C. §§ 524(g) and/or (h). That means the facilities had been claimant-negotiated and claimant-accepted. Many of the facilities had an ownership interest in the operating company as well. While the court encourages the parties to pursue their § 524(g) negotiations, the court holds that the NGC plan and confirmation order do not compel claimants to a futile process that cannot fulfill the plan mandate.

In its bench ruling at confirmation, the court found that asbestos disease claimants would likely accept settlement offers. Bench ruling, at p. 28. From the filing of the National Gypsum bankruptcy petition to confirmation, asbestos disease claims had been resolved in the tort system with NGC a Center member. From confirmation until June 16, 2000, claims continued to be resolved in the tort system with ACMC a Center member. Now, going forward, if New NGC funds the trust at the level found below, the court continues to find that asbestos disease claimants will likely accept settlement offers and indeed release New NGC, even if the amount is discounted by factors that the tort system would recognize. But the Legal Representative's motion to terminate the channeling order focuses on an unfunded trust, capable of paying only pennies on the tort system dollar. Claimants will only use that system if they are not compelled to release New NGC.

■ Without a requirement that claimants release New NGC, the court agrees with the Chambers' opinion that claimants would seek a recovery from the trust, however small. The court can perceive no reason why they should not be allowed to proceed on a dual track. The trust cannot resolve their claims. But the trust may be able to contribute, in effect, 4.1 to 6.5 percent to the resolution of their claims. The claimants remain trust beneficiaries and should receive their proportionate share of trust assets, without forfeiting their tort system rights. Accordingly, for an unfunded trust, unknown and future asbestos disease claimants may apply for the trust distribution and pursue New NGC. Should they receive a payment from the trust from the limited fund alternate facility, and obtain a recovery from New NGC by judgment or settlement, under non-bankruptcy law the court would expect that the trust payment would be credited against the amount of the judgment or settlement. The alternate facility will provide for contribution claims by New NGC. Accordingly, should the claimant not seek or obtain a recovery from the trust but obtain a judgment or settlement from New NGC and should New NGC pay that judgment or settlement, the alternate facility will provide that New NGC may apply for a contribution payment in the amount that would have been paid to the claimant.[6]

---

6. The requirement for contribution supports the court's holding that for channeling order purposes claimants have exhausted trust remedies with a limited fund facility paying pennies on the dollar. If New NGC's argument was correct, the plan had no need for a con-

The court finds that it may amend and modify the plan procedures to authorize the unknown and future asbestos disease claimants, as beneficiaries of the trust, to seek recovery from the trust, even if the channeling order terminates pursuant to this memorandum opinion because New NGC declines to fund the trust, as provided below. The claimants may seek, pursuant to the facility, a recovery of 4.1 to 6.5 percent of the tort value of their claims, in exchange for a release of the trust and ACMC. The claimants may pursue their state law remedies, if any, against New NGC. Because the claimants may not have a state law remedy against New NGC in a particular jurisdiction and because of the Fifth Circuit's liability ruling, the court amends and modifies the plan procedure to assure that the claimants at least be able to seek their share of trust assets, should they establish claims pursuant to the facility procedure. The plan itself allows the court to amend and modify the plan procedures. The court exercises that authority to assure that the unknown and future claimants not be precluded from any recovery by virtue of the Fifth Circuit's liability ruling.

On the other hand, if New NGC funds the alternate facility, then the trust will have assets to pay settlements that mirror the tort system. Similarly situated claimants would be treated similarly to those who have previously settled with the trust and those who will assert claims in the future. The channeling order would then remain in place. Claimants would be expected to pursue all trust remedies. The process would not be futile because the trust would be funded at a level to pay tort system values. Claims would be resolved as mandated. New NGC would be released. New NGC would be protected from asbestos-related litigation and trust beneficiaries will be reasonably compensated for their injuries.

During the course of the hearings, counsel mused on whether the court would craft a decision that would entice New NGC to make the contribution. In addition, counsel stated for the record that the parties had been engaged in significant discussions to find a binding resolution by invoking the provisions of 11 U.S.C. § 524(g). The court appreciates and encourages that effort. The court considers the hearing exhibit "New NGC's Exercise of Funding Option" as evidence that New NGC would pursue those negotiations. If the court's findings and conclusions assist that effort, fine. But the court focuses its attention on the findings and conclusions necessary to adjudicate the pending contested matters. In doing so, the court will adjudicate the amount that New NGC would have to contribute to the trust to maintain the channeling order.

██ New NGC would then have to make its business judgment on whether the protection from litigation provides sufficient benefits to support that cost. In analyzing settlements, courts recognize that parties must weigh the risks of litigation. *See, In the Matter of Cajun Electric Power Cooperative, Inc.*, 119 F.3d 349, 356–57 (5th Cir.1997) (discussing criteria for bankruptcy court approval of a settlement); *Matter of Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir.1980) (same). The plan imposes no obligation on New NGC to fund the trust. The Fifth Circuit has held that the plan imposes no liability on New NGC for non-discharged claims. But the Fifth Circuit has also held that New NGC may have successor liability, if so determined by the states. Without the protection of the channeling order, the successor liability issue may have to be litigated state by state and maybe case by case. Outcomes may vary. And if a state imposes successor liability, the state court may determine that the plan's limitation on pu-

---

tribution requirement. The claimant would have had to take his pennies, give a release and never have access to New NGC; hence, New NGC would never have a contribution

claim. The court may not read the contribution provision out of the plan, just as it may not convert a channeling order into a permanent injunction.

nitive damages may not govern, given the Fifth Circuit's questioning of this court's jurisdiction to bar punitive damages for claims not resolved by the trust. *See, National Gypsum,* 219 F.3d at 488–89.

One final point on this motion, New NGC correctly observes that the termination of the channeling order ends the tolling of the statute of limitations for unknown asbestos disease claimants. *See* Confirmation Order, § 10(b)(3). New NGC hypothesizes that an unknown claimant may not want that result at this time. The Legal Representative has been charged to represent the interests of the unknown claimants and he may advocate relief he deems appropriate.

If an appellate court mandates, however, that this court erred in holding that an unfunded trust cannot resolve claims so that the channeling order terminates, then the court would employ the following standard for determining when a claimant has exhausted his trust remedy or remedies for an unfunded trust. As discussed above, the court will not adopt the standard urged by New NGC. That standard is onerous, unfair and frustrates the court's confirmation ruling that the unknown and future claimants may not be permanently enjoined from proceeding against New NGC. As counsel for several claimants argued, the trust and the individual claimant will know if a settlement can be reached after the trust tenders a settlement offer, the parties negotiate the offer and the claimant rejects it. Once the facility becomes operative, Hilton testified that offers should be extended 90 days after receipt of the claims information. Accordingly, claimants may file motions to terminate the channeling order 90 days after they submit claim information to the trust. By the time the motion is set for hearing, the court would anticipate that the offer would have been extended and the negotiations commenced. If the claim has not been settled or the claimant has not opted to continue with the process, the court will consider that the trust remedy has been exhausted.

### The Alternate Facility

◾ ACMC, the trust, the Legal Representative and New NGC agreed at the commencement of the hearings to several elements of the alternate facility. During the course of the evidentiary hearings, other parties in interest joined in the agreement, with parties agreeing to modifications. The parties specifically identified remaining differences or disputes, submitting them to the court for resolution. In addition, the modified agreement deferred several issues to the court for resolution. Exhibit B attached to this memorandum opinion and made a part of these findings and conclusions reflects the agreed provisions, the remaining disputes and the matters deferred to the court. Exhibit B is exhibit IA of trust hearing exhibit 5C.

The plan's asbestos disease claims resolution procedures provide that the claim information shall be mailed by the trust within one year after the procedures are instituted. The alternate facility provisions of exhibit B provide that the claim filing information shall be mailed within one year after the court approves the procedures. That timing comes sooner than the plan procedures and therefore complies with the plan.

The plan procedures provide that claims information be sent to people who file proofs of claim with the court. The court, however, did not invoke a bankruptcy claims process for asbestos disease claims. Consequently, the court must adopt the functional equivalent of that requirement. The provisions of exhibit B contain a functionally equivalent system provided the trust publishes public notices of the procedure in publications likely to reach persons who represent asbestos disease claimants, such as law firms, lawyer groups and associations, unions, newsletters and so forth. Claims filing information must also be provided to any person with a claim who becomes known to the trust through any means.

Under the general principles for asbestos disease claims resolution, the description of the determination of payment amounts varies somewhat from the plan procedures. The variances however refine definitions and criteria and are therefore consistent with the plan. The facility employs the term allowed liquidated value (ALV) for the plan procedures' full liquidated value. The plan procedures strive for consistency in the payment percentage of the liquidated value, which the facility adopts. The facility correctly incorporates a reference to tort system values to reflect the plan procedures' reference to "full value." The plan procedures' requirement for a review of payment percentages "from time to time," has been fairly implemented with a requirement that the review be no less frequent than every two years.

Paragraph C of the general principles refers to the supervising court and not the bankruptcy court. This court functions as the supervisory court of the trust pursuant to the plan. The reference is therefore appropriate.

The facility's procedures expand on the processing of expedited review (ERC) and individual review (IRC) claims over the less specific plan procedures. That specification is appropriate to implement the processes.

The plan procedures contemplate that IRC and extraordinary claims would be settled upon a consideration of factors, including exposure to National Gypsum asbestos-containing products. The facility's provisions in exhibit B delineating the exposure criteria appropriately implement the plan procedures. Similarly, the plan procedures contemplate medical criteria. The confirmation bench ruling and confirmation order expressly provide for medical criteria. The facility procedures of exhibit B therefore appropriately include a section on medical proof.

The court turns to the remaining issues in the order they appear on exhibit B.

*Claim Disallowance.* The procedure in exhibit B directs that the trust disallow a claim not filed within 12 months of mailing unless the claimant can provide a justification. The plan procedures contain that requirement. Several claimants, nevertheless, question the provision. They contend that a claimant should be able to defer submitting claim information if the claimant chooses to do so. They contend that the delay harms the claimant, not the trust. However, the trust must allocate its assets among the 79,000 pending claimants and an additional 415,887 projected claimants over 40 years. To perform that function, the trust must be empowered to eliminate claims of claimants who do not timely seek a recovery from the alternate facility. The court therefore finds that the plan procedure should not be modified.

*Punitive damages; interest.* The BI TAC contends that asbestos disease claims should include punitive damages and pre- and post-judgment interest, to the extent allowed by state law. The TAC maintains that the facility should not deviate from the tort system, and, thus, for claims in states that would allow these items, the allowed liquidated value of the asbestos disease claims by the trust should factor these items. The plan procedures provide that an alternate facility would not allow punitive damages, above at pp. 191–92. The known asbestos disease claimants at confirmation were represented by a committee and by counsel; the unknown and future claimants were represented by the Legal Representative. None of them objected to the elimination of punitive damages. None of them sought relief by post order motion or appeal. The elimination of punitive damages protects trust assets to further the similar treatment of all similarly situated claimants. While acknowledging that objective, the BI TAC asserts its position to be consistent with the position advocated by Ganske and Moore that the court may not alter or impair the tort system rights of non-Bankruptcy Code claimants.

The court recognizes that the Fifth Circuit has questioned the court's jurisdiction to limit punitive damages, but the Court did so in the context of assessing liability of New NGC for unpaid claims, not with regard to the alternate facility. *National Gypsum*, 219 F.3d at 488–89. This memorandum opinion addresses only the alternate facility and settlement of asbestos disease claims by the facility. As addressed in the section on the motion to terminate the channeling order, this court defers to the state courts on the question of punitive damages for claimants who obtain relief from the channeling order.

Similarly, the plan procedures provide that the trust shall not pay pre- or post-judgment interest. *See*, above, at pp. 191–92. The same analysis applies to that plan procedure. The plan procedure balanced the rights of individual claimants with the interests of all similarly situated claimants and eliminated punitive damages and interest to preserve assets and strive for similar treatment. No relief having been sought from those plan procedures and the need for the procedures remaining, neither ACMC nor the trust shall consider punitive damages in considering the value of a claim and they shall not pay pre- or post-judgment interest, nor any other type of interest, on a claim. But these restrictions with respect to New NGC apply only if the channeling order remains in effect. If the court terminates the channeling order, the issues of punitive damages and interest must be determined by state courts under state law.

*Election to file or reject.* The trust proposes that a claimant should be able to elect whether or not to file a claim in the event of a facility that does not obtain funding from New NGC. Since the court will establish ERC and ALV values and since an unfunded facility will likely pay 4.1 to 6.5 percent of those values, the trust suggests that a claimant should be allowed to decide up front whether or not to pursue that recovery. If the claimant has no intention of accepting a settlement in the 4.1 to 6.5 percent range, the claimant should not be compelled to proceed under the alternate facility. Rather, the trust suggests, the claimant should be able to reject the process. The court should deem that the trust cannot resolve the claim and terminate the channeling order.

The Legal Representative and the BI TAC support the trust's suggestion. Several claimants support the concept but recommend that the election be made after the trust tenders a settlement offer to the claimant. New NGC opposes the suggestion, advocating that a claimant must exhaust the alternate facility process through the trust's offer of payment after judgment before the claimant may seek relief from the channeling order.

In the section on the Legal Representative's motion to terminate the channeling order, the court has held that an unfunded trust cannot resolve claims and hence claimants have exhausted trust remedies. Without funding the channeling order will terminate, making the trust's suggestion unnecessary. The court has alternatively found that if an appellate court disagrees with the finding on exhaustion, the claimant must submit to the process, but exhaustion occurs if a claim is not settled in 90 days after the submission of the claim. These alternative rulings obviate the need to further consider the trust's proposal. For these reasons, the court does not accept the proposed procedure.

*Settlement Offers.* The facility requires that fixed discounted payment schedules be developed for ERC claims. The facility provides that the trust will determine the ALV for injury categories for IRC claims. As the court explained during the course of the hearings, the court does not accept the postponement of these determinations. As summarized above, the plan and confirmation order mandate that the court establish these settlement levels for the alternate facility. In addition, funding levels cannot be established until the settlement levels have been established. The court also does not accept a different base settle-

ment average for ERC and IRC claims. Both must be based on values mirroring the tort system, with percentage payments or discounts to reflect the process. Discounts and payment percentages will vary to reflect the different procedures, but the base should be the same. Nor does the court accept the contention that it must hold additional evidentiary hearings to determine these values. These hearings developed an extensive evidentiary record upon which the court may make the requisite findings. Accordingly, definitions of ERC settlement amounts, ALV and average value shall be read consistently with these findings and conclusions.

As found in the section on claims and values, above at p. 199, the court adopts ACMC's share of the Center-negotiated and billed group settlements for January 1, 1998, to August 28, 2000, as best mirroring the tort system in the period of time closest to the implementation of the facility. Those values are set out on Exhibit A to this memorandum opinion.

The facility has categories for non-malignant I, II and III. The group settlements for non-malignant diseases do not reflect that break down. Hilton extrapolated the breakdown as follows: Non-malignant I, $1,781. Non-malignant II, $900. Non-malignant III, $450.

Dr. Paul E. Epstein, New NGC's expert witness, testified that treating physicians would recommend medical testing and monitoring for persons with a diagnosis falling under the definitions of non-malignant II and III. Those costs would range from $155 to $455 per year. The low end would cover chest x-rays and an exam. The high end would cover chest x-rays, spirometry, lung volume and diffusion capacity tests, and an exam. Epstein estimated the costs of an exam at $55; the chest x-rays would cost between $100 to $150; spirometry, $90; lung volumes, $90 to $100; and diffusion capacity test, $60. Chambers recognized that persons in those categories would incur these expenses. Hilton's extrapolations fairly re-

flect Epstein's cost estimates for a year or more depending on the condition and thus constitute a fair measurement of the claim for settlement purposes. The court therefore finds that the settlement average for non-malignant I shall be $1,781, non-malignant II shall be $900 and non-malignant III shall be $450.

New NGC contends that the trust should make no payment to non-malignant II and III categories, reserving its resources for categories Epstein recognizes as diseases. Epstein testified, however, that persons in these categories will incur medical testing and diagnostic expenses. He would prescribe those diagnostic procedures for his patients. Chambers recognized that persons in those categories would have medically prescribed expenses. In many jurisdictions, those persons obtain recoveries in the tort system. The trust must pay similarly situated claimants similarly. The court, therefore, establishes the ERC and ALV values for these categories.

The facility contemplates using a fixed payment schedule for ERC claims and a negotiated process for IRC claims. For ERC claims, the above findings shall be used as the fixed payment schedules to be discounted as addressed below. For IRC claims, the findings shall be the ALV, to be discounted as addressed below. The IRC claims process contemplates that the trust and claimant will then engage in a negotiation process to derive at an actual settlement. The court considers the ALV to be the macro determination, supplied by the court. The trust may employ the micro factors contained in exhibit B.

The facility reflected in exhibit B has been designed to accommodate a facility funded by New NGC and a facility without additional funding. For a funded facility, the ALV shall be discounted by the following two factors, irrespective of micro factors considered by the trust. The plan procedures outlined above mandate that the alternate facility employ values reflecting historical payments by National Gyp-

sum for similar claims. Those historical payments had been made in the tort system. The court has adopted values derived from settlements in the tort system, using ACMC's share of Center-negotiated settlements. The plan procedures and confirmation order provide that the trust may pay a percentage of those amounts. Percentage discounts may reflect considerations made in non-bankruptcy settlements not included in the values adopted by the court. Because an unfunded facility will most likely pay in the range of 4.1 to 6.5 percent, these factors would not be applicable.

First, except for mesothelioma claims, the ALV shall be discounted by five percent if a settlement is offered from six months to one year sooner than the average time from complaint to group settlement in the tort system for ACMC as reflected in hearing exhibit 9; by an additional five percent if settled from one to two years less than the average time of resolution in hearing exhibit 9; and by an additional five percent if settled in two or more years less than the average time of resolution in hearing exhibit 9. The hearing exhibit reflects the average time of settlement per state from time of filing of complaint to settlement for group settlements. The court has adopted the group settlement as the standard. The facility is designed to resolve claims in 90 days. Comparing the anticipated time to the tort system averages, the trust will be offering the ALV in less time than the average group settlement had been reached in the tort system. Because of the time value of money, the ALV must be discounted. Hilton recommended a five percent discount per year based on the fiduciary standard used by the trust. The court accepts that standard. As recognized during the hearings, exhibit 9 reflects anomalies for certain jurisdictions. Therefore, to eliminate the anomalies, the court limits the discount for the time value of money to the two or more years standard. Finally, the evidence reflects that the several states promptly and often with priority address

mesothelioma claims. The court therefore finds that a present value discount for mesothelioma claims would not be appropriate.

The Fifth Circuit has taught that settlements of litigation contemplate and reflect risks of litigation. *See, Cajun Electric,* 119 F.3d at 356. From January 1, 1998, to June 16, 2000, the Center negotiated the group settlements, adopted as the tort system mirror by this court, with the law of this case reflecting New NGC liability under the plan for unpaid, non-discharged asbestos disease claims. On July 18, 2000, the Fifth Circuit changed the law of the case. Now unpaid, non-discharged asbestos disease claimants confront the risk of litigation of successor liability in the several states. Without divulging attorney client privileges, Hilton testified that the trust's attorneys assessed a range of results in that litigation. This court anticipates that the outcome of the issue may vary by jurisdiction. Consequently, the claimants face a substantial risk of litigation not reflected in the ALV. Since the range could include no recovery from New NGC in a particular state, the trust must discount the ALV by 25 percent to reflect this risk of litigation. A greater discount would not be warranted for this risk because of the potential upside of punitive damages and pre- and post-judgment interest.

For the ERC in a funded facility, these two factors shall be applied to the fixed schedule to produce the ERC payment. The trust will not consider any micro factor. But the ERC claimant will obtain a prompt, relatively easy, predictable settlement. If the claimant wants to negotiate micro factors or opt for mediation or arbitration or trial, the claimant must choose the IRC process.

*Releases.* New NGC contends that claimants accepting a settlement should be compelled to release New NGC whether or not New NGC funds the facility. As found in the section on the Motion to Terminate

Channeling Order, above, at p. 209, New NGC must be released for settled claims if it funds the facility in the amount and in the manner found in these findings and conclusions. For an unfunded facility, the trust may settle claims in exchange for releases of the trust and ACMC. *See,* above, p. 193. For an unfunded facility, while claimants may elect to release New NGC, they may settle with the trust without releasing New NGC.

*Channeling order as to the trust/ACMC.* New NGC contends that if the channeling order terminates to permit asbestos disease claims to be brought against New NGC, the channeling order should terminate as to all persons. Under the plan, the channeling order applies to all persons. Plan, § 6.5. New NGC has previously filed a motion to terminate the channeling order as to all persons, as or when the court terminates the channeling order as to New NGC. The court granted the motion in part. The court held that the channeling order should not be applied in a manner to limit New NGC's ability to defend against successor liability. However, New NGC need not commence litigation against ACMC or the trust for the purpose of asserting contribution or indemnification claims. As provided above, at p. 208, the facility will provide for contribution claims without the need for New NGC to commence litigation. Accordingly, should the channeling order terminate to permit asbestos disease claimants to bring actions against New NGC, then the channeling order shall be modified to the extent necessary to enable New NGC to fully litigate its defenses, but in all other respects New NGC may not commence litigation against ACMC or the trust with regard to asbestos disease claims.

*Statute of limitations.* Exhibit B provides that asbestos disease claim litigation pending when ACMC terminated its Center membership would be stayed until the claimant rejected an arbitration award. The exhibit further provides that other claimants may file suit after the rejection of an award from non-binding arbitration. These provisions are consistent with the plan procedures. *See,* above, p. 192. The exhibit then establishes a formula for the tolling of the statute of limitations. The exhibit does not fully conform to the confirmation order and must be modified to comply with the confirmation order. The order provides that if ACMC terminates its Center membership, "the applicable statute of limitations regarding any unresolved Unknown Asbestos Disease Claims (which was not time barred as of the date [ACMC] ceased to participate in the Center ...) will be tolled until the termination of the Channeling Order." Confirmation Order, § 10(b)(3). Because the confirmation order temporarily enjoined the pending cases from commencing litigation against New NGC, the confirmation order must be read to toll the statute of limitations against New NGC until the termination of the channeling order.

*Payment of judgments.* The provisions of the facility concerning the payment of judgments vary from the plan procedures. The BI TAC does not agree to the provision. To assure consistency with the position advocated by Ganske and Moore on the motion to cancel the alternate facility hearings, the BI TAC argues that payment of judgments must not vary from the tort system. While preserving this position, the BI TAC acknowledges that the facility's proposed payment schedule varies from the plan procedures. By imposing a limit on payment of judgments by a multiple of three times scheduled values, the BI TAC asserts that the proposal unfairly restricts payments beyond those imposed by the plan procedures. Other claimants contend, on the other hand, that the court should intervene when the trust makes payments on judgments to protect trust assets to assure similar treatment of all similarly situated claimants.

As outlined above, the plan procedures contemplate that the trust pay judgments in excess of the full liquidation value based on a percentage designed to achieve to the

extent possible a similar payment to similarly situated claimants. Applying that percentage protects the other claimants.

The plan procedures impose a five year waiting period for payments on judgments in excess of the full liquidated value and then authorize payments over five years if the trustees determine that payment at five years would adversely affect payment to other claimants. That process balances an individual claimant's right to a jury trial with the trust mandate to pay similarly situated claimants similarly. The court finds that the plan procedure should not be modified. Accordingly, exhibit B must be modified to provide for payment of judgments consistently with the plan procedures.

*Contribution.* The parties have agreed to the contribution provisions of the facility pursuant to exhibit B. With regard to contribution or indemnification claims asserted by New NGC, to the extent that the provisions of exhibit B are inconsistent with this memorandum opinion, this opinion shall govern.

*Exposure.* Exhibit B requires that the claimant demonstrate exposure to asbestos or asbestos-containing products that were supplied or manufactured by NGC. New NGC contends that the claimant should be required to demonstrate occupational exposure. The exhibit continues by explaining that the exposure could have occurred while the exposed person was engaged in carrying out job responsibilities or avocational pursuits or, in the case of a spouse or household member, as secondary exposure. New NGC contends that the explanation should not include a reference to avocational pursuits, and that exposure references should be to occupational exposure. The exhibit then requires that for disease categories other than mesothelioma, the evidence must be sufficient to show exposure to the asbestos or asbestos-containing product on a regular basis over some extended period of time in proximity to where the exposed person actually worked, or an equivalent exposure second-ary to occupational or avocational exposure. New NGC opposes the reference to avocational exposure.

The parties do not contest that the facility must assure that the claimant demonstrate exposure and that for disease categories other than mesothelioma, the claimant demonstrate that the exposure have occurred on a regular basis over time in proximity to where the person actually worked or an equivalent exposure. Because of that requirement, the exposure need not be limited or restricted to occupational exposure. The claimant must show the requisite exposure. Chambers testified that most exposure to NGC asbestos-containing products would be an occupational exposure. If the claimant establishes that exposure, the claimant's occupation has no bearing. The exhibit's explanation includes a reference to a claimant's job, and, for disease categories other than mesothelioma, includes references to exposure where a person actually worked or its equivalent. The exhibit need not therefore include the requirement "occupational" exposure requested by New NGC.

During her testimony, responding to hypothetical situations posed by counsel for the BI TAC, Chambers also recognized that persons may be exposed to NGC asbestos-containing products in situations other than occupational. If they had been, the exhibit requires that they demonstrate that exposure and that for disease categories other than mesothelioma, that they demonstrate an exposure equivalent to that shown by a person exposed over time in proximity to where the person worked. But Chambers testified that from her review of other facilities, adding an "avocational" description would be vague and confusing. She testified that other facilities did not include that description and therefore the provision would be difficult for the trustees to apply. In the examples she addressed during her testimony, she suggested that they be included in an expansive approach to occupational exposure.

The BI TAC responded that a person should not be excluded if the exposure did not occur in connection with the claimant's occupation. An "avocational" provision assures that persons exposed in work or even employment that is beyond or subordinate to their regular occupation be included.

The court therefore concludes that Exhibit B contains an appropriate description of the exposure requirement.

*Medical proof.* Lung cancer. Under 9.B.2., New NGC contends that the claimant must demonstrate "heavy" occupational exposure to asbestos-containing material. The BI TAC contends that the claimant should only have to demonstrate exposure to asbestos-containing material. The demonstration of exposure under 9.B.2. provides an alternative manner of qualifying for compensation for lung cancer. As such, the alternative focuses on exposure to asbestos-containing materials in employment while working in the immediate area of visible dust. Use of the qualifying "occupational" exposure is redundant. New NGC's request to require "heavy" exposure is likewise redundant. The definition requires 15 years of exposure in employment regularly requiring work in the immediate area of visible dust.

*"Qualified Physician".* For several medical proof requirements, the BI TAC would include a report from a qualified physician. Epstein's testimony recognized that diagnostic evidence includes physician reports. Accordingly, the court adopts the provision that diagnosis may be by a certified B-reader or by a report from a "Qualified Physician."

"Qualified Physician" is a defined term in exhibit B. A person meeting that definition should be able to submit a report addressing the medical proof. New NGC and the trust contend that to assure the requisite degree of medical certainty and reliability, if an internist, the internist must have an appropriate subspecialty, and if an osteopath, the osteopath must have an appropriate subspecialty or its equivalent. They argue that if the facility accepts reports from qualified physicians, then the court must assure medical certifications which come with the subspecialty requirement for internists and osteopaths. Also, the BI TAC and other claimants appearing at the hearings would include occupational physicians or any claimant's treating or personal physician as Qualified Physicians. The court adopts alternative standards, depending on funding, as provided below. For a funded facility, before expending the assets invested by New NGC, the trust and New NGC must have the assurance of medical proof that comes with the specializations required by the provisions of exhibit B. For a funded facility, the expense to the claimant of obtaining that diagnosis would be supported by the settlement amounts. Counsel for several claimants suggest that a person in a rural area should be able to rely on his general practitioner. For a claimant going to trial, the court is confident that the general practitioner would refer the claimant to a specialist and the claimant would incur the expense of visiting the specialist. Counsel also suggests that the audit process should be a sufficient protection. Without invoking the audit process, the trust should be able to obtain a report by a physician with subspecialty experience. However, in the event that New NGC does not fund the facility, claimants should be able to submit medical proof from an internist, occupational physician or osteopath without a subspecialty or its equivalent. For an unfunded facility, the small amount of a recovery does not justify the additional expense to the claimant.

*Bilateral.* The BI TAC contends that claim requirements should not include a requirement of a bilateral diagnosis. The TAC asserts that the tort system compensates persons with a unilateral diagnosis. Counsel for several claimants appearing at the hearings agreed with the TAC. Epstein testified that breathing is a bilateral process. As a result, the trust and New

NGC suggest that a bilateral diagnosis should be required to preserve trust assets. Epstein did not testify that a bilateral diagnosis was required for a medical finding of the non-malignant diseases and conditions. Accordingly, the court does not impose one. The concerns of the trust and New NGC for a funded facility have been addressed by the specialization requirements for a "Qualified Physician."

*Condition.* For pleural changes under non-malignant III category, the BI TAC maintains that the facility should not reference a pleural disease, but rather should reference a pleural condition. Epstein testified about definitions for the word "disease." The facility need not be bogged down by the semantic differences. The category should recognize a condition, whether or not a particular physician would label the condition a disease.

*Non-malignant categories.* The BI TAC would combine non-malignant II and III categories into a single category. The Center does not separate non-malignant diseases and conditions for settlement analysis and reporting. Hilton did not engage a scientific study to support separating the categories. New NGC likewise did not advance a scientific study to support the separate categorization. Nevertheless, the trust, ACMC, the Legal Representative and New NGC basically agreed on the categories and their definitions. The court has resolved the specific disputed provisions submitted by the BI TAC and the claimants appearing at the hearings. Hilton extrapolated settlement values from the Center aggregate average settlement values for non-malignant claims that fairly reflect the medical expenses identified by Epstein. The separate categorizations provide a structure for the trust to offer settlements that reflect the costs of x-rays and other medical diagnostic tests for the different conditions. The court therefore overrules the objections to the separate categories. However, for an unfunded facility, the court will address streamlined provisions for recovery which

should effectively address the concerns of the BI TAC and the claimants.

*Confidentiality.* New NGC contends that claims information should be released to New NGC. The plan procedures do not include a confidentiality provision, but they do make positions taken during alternate dispute resolution procedures inadmissible at trial. *See,* above, pp. 192–93. The trust observes that the confidentiality provision will encourage open and frank settlement discussions. The BI TAC further observes that the facility amounts to the functional equivalent of a court-imposed settlement conference and should enjoy the same evidentiary protections. The court agrees, and, accordingly, overrules New NGC's objection to the provision. However, if New NGC funds the facility, New NGC should have the type of access to information of claims settled with New NGC monetary contributions as New NGC has had to date.

*Information required.* New NGC requests that the court include names of other asbestos products to which a person was occupationally exposed. Hilton testified that the Center considers exposure to non-NGC asbestos-containing products in settling claims. Chambers testified that other facilities look to a broad range of information that would include this information. The information would aid the trust in negotiating a settlement with a claimant. The court therefore includes the provision.

*Chest x-ray definition.* Counsel for several claimants questioned several provisions of the definition of "chest x-rays." Counsel suggested that one view rather than four views, taken any time rather than within one year, and graded one or two rather than one, would be sufficient evidence admissible at trial. For an unfunded facility, the court agrees. But for a funded facility, the court would strike the same balance as the court struck for the definition of "Qualified Physician" and the bilateral versus unilateral question. The settlement levels justify the extra ex-

pense of obtaining four views within one year. Those requirements provide a measure of assurance to the trust and New NGC concerning the claim and the use of New NGC's invested funds to settle the claim. But for an unfunded facility paying in the likely range of 4.1 to 6.5 percent, the court would not impose the extra expense on the claimants. The trust may make its determination and settlement offer in an unfunded situation with one view at grade quality one or two taken any time.

The procedures and provisions of exhibit B shall be revised to reflect these findings and conclusions.

### Funding Amount

■ Using the parties' stipulations regarding future claims and the ALV amounts established in the section Claims and Values, pp. 27–28, and the Alternate Facility, above, p. 213, New NGC would have to fund approximately $900 million to $1 billion today to fully fund the trust through 2039. That assumes that the trust will realize after tax returns on the investment of that amount from 3.75 percent to 5.85 percent annually. The court does not expect a capital outlay of that magnitude. First, if New NGC had been prepared to make that commitment now, the parties would have reached by settlement a global protection for New NGC through the auspices of 11 U.S.C. § 524(g) or other devices. Second, prediction of actual claims with product identification and settlement amounts over time is too difficult to predict to expect that capital outlay now. Third, New NGC may achieve a better rate of return on its investments than the trust, given the fiduciary restrictions on the trust. Consequently, the court does not expect nor require that New NGC fully fund the trust now for the next 40 years to maintain the channeling order.

At the other extreme, New NGC could assert that it should be given the option of funding each settlement on a claim by claim basis. That is, the facility would process the claim to settlement. The trust would fund the settlement using its 4.1 to 6.5 cents on the dollar. New NGC could then choose to fund the remainder of the settlement. If it elected not to, the channeling order would terminate. That process would be fundamentally unfair to the claimants, and burdensome to the claimants, the trust and New NGC. After each settlement, the trust would have to consult with New NGC and New NGC would have to make a funding decision. That process would delay payment of the claim, nullifying the present value discount to the claim. If New NGC would be inclined to fund settlements as entered, New NGC would likely fund the trust for relatively short periods of time. If New NGC would not be inclined to fund the settlements, no party in interest would be served by delaying implementing an unfunded facility, with the corresponding termination of the channeling order.

Rather than ordering that New NGC fully fund the trust for 40 years now to preserve the channeling order or, conversely, permit funding on a claim by claim basis, the court concludes that funding in two year increments would more fairly balance the competing considerations. Anticipated claims, asset availability and liability determinations would be more predictable. Short term funding would enable New NGC to maintain control of its assets, making its own investment and asset management decisions while permitting monitoring of the resolution of claims in the alternate facility.[7] For the claimants, the short term funding would mean resolution of the next batch of claims with dollars that mirror the tort system. For the trust, it would justify the expense of establishing and implementing a funded facility yet assure that if New NGC does not fund in future years, the trust will maintain its

---

7. The court considers New NGC's exhibit titled "New NGC Exercise of Funding Option" as evidence that New NGC contemplates funding in short term rather than long term intervals.

current level of assets to make the likely 4.1 to 6.5 percent distributions to remaining claimants in the future.

Hilton testified that it may take up to one year for the facility to be fully operative, if it employed Trust Services, Inc. Hilton recognized that other services may be available and the trust would have to investigate alternative providers of administrative services. Once operative, the facility would begin distributing claims forms. Hilton thought it could take until 2002 for the facility to actually begin making payments on claims. Chambers agreed it could take that long. The court considers this a conservative estimate of start-up time. Hilton expected that initially the facility would require six months to process claims but that the time would be reduced to 90 days. If the alternate facility begins implementation on January 2, 2001, with these expectations, the facility could be processing claims by mid-year and paying claims by year end.

Projecting forward, by December 31, 2002, despite the heavy concentration of pending claims, the court would expect that the facility would have made settlement offers for years 2000 and 2001 and at least half of the claims for 2002. Based on the parties' stipulation, the court uses the Peterson projections for the claims for those years.

The court then applies the ALV established in the section on the Alternate Facility, above, at p. 213, for the IRC claims process with the discounts reflecting the time value of money for one year and the risk of litigation on successor liability. *See,* pp. 213–15.

The court then multiplies the ALV times the projected number of claims per category to derive at the anticipated settlement payments. The court then totals those amounts for 2000 and 2001 and adds half the amount for 2002 to arrive at the funding requirement from inception of the facility through December 31, 2002.

Based on that process, the court finds that the funding requirement for New NGC to maintain the channeling order through December 31, 2002, is $144,581,078.

The following charts set out the calculations:

**Average ALV Less Discounts**

| | | | | |
|---|---|---|---|---|
| Mesothelioma | 40,629 | × | 75% | 30,472 |
| Lung Cancer | 6,879 | × | 70% | 4,815 |
| Other Cancer | 2,909 | × | 70% | 2,036 |
| Non-malignant | | | | |
| I | 1,781 | × | 70% | 1,247 |
| II | 900 | × | 70% | 630 |
| III | 450 | × | 70% | 315 |

**2000 Claims**
Trial Exhibit 16, 2000–to–date + Residual

| | | | | |
|---|---|---|---|---|
| Mesothelioma | 934 | × | $30,472 | $28,460,848 |
| Lung Cancer | 1,668 | × | 4,815 | 8,031,420 |
| Other Cancer | 478 | × | 2,036 | 973,208 |
| Non-malignant | | | | |
| I | 17,294 | × | 1,247 | 21,565,618 |
| II | 17 | × | 630 | 10,710 |
| III | 6,735 | × | 315 | 2,121,525 |
| | | | | $61,163,329 |

**2001**

| | | | | |
|---|---|---|---|---|
| Mesothelioma | 917 | × | $30,472 | $27,942,824 |
| Lung Cancer | 1,605 | × | 4,815 | 7,728,075 |
| Other Cancer | 459 | × | 2,036 | 934,524 |
| Non-malignant | | | | |
| I | 11,175 | × | 1,247 | 13,935,225 |
| II | 5,587 | × | 630 | 3,519,810 |
| III | 6,517 | × | 315 | 2,052,855 |
| | | | | $56,113,313 |

**2002**

| | | | | |
|---|---|---|---|---|
| Mesothelioma | 900 | × | $30,472 | $27,424,800 |
| Lung Cancer | 1,541 | × | 4,815 | 7,419,915 |
| Other Cancer | 441 | × | 2,036 | 897,876 |
| Non-malignant | | | | |
| I | 10,808 | × | 1,247 | 13,477,576 |
| II | 5,404 | × | 630 | 3,404,520 |
| III | 6,299 | × | 315 | 1,984,185 |
| | | | | $54,608,872 ÷ 2 = |
| | | | | $27,304,436 |

Funding Alternate Facility
Inception through December 31, 2002

| | |
|---|---|
| 2000 claims | $ 61,163,329 |
| 2001 claims | 56,113,313 |
| ½ 2002 claims | 27,304,436 |
| | $144,581,078 |

With the infusion of the $144,581,078, the trust should settle the claims in amounts that mirror the tort system while maintaining other assets for future use should New NGC decline to fund in the future. New NGC must deposit that amount with the trust by December 31, 2000. If it does so, the channeling order will remain in place and the trust and ACMC shall implement the alternate facili-

ty as a funded facility beginning January 1, 2001. With that funding, the court will set a hearing during its trial week in September 2002 to assess performance and to determine funding requirements for the next two year period beginning January 1, 2003. If funding continues, the court will continue that process each successive two-year period.

If New NGC does not fund the trust by December 31, 2000, the court will enter an order granting the Legal Representative's motion to terminate the channeling order, and the trust and ACMC shall implement the alternate facility on January 1, 2001, as an unfunded facility.

If New NGC funds the first two-year period, but declines to fund future two-year periods, the court would at that time grant the Legal Representative's motion to terminate the channeling order as to remaining and future claimants and direct the trust and ACMC to modify the facility to an unfunded facility.

The court will set funding requirements to assure that in the event that New NGC declines to fund future two-year periods, the trust will have assets remaining to make payments to unpaid trust beneficiaries in the 4.1 to 6.5 percent range which they would likely receive should New NGC decline to fund the facility at all. Accordingly, remaining trust asbestos disease beneficiaries will be no worse off in the future than they would be today with an unfunded facility.

As the court analyzed above, allowed claims as processed by the facility will differ from the Peterson projections because of the product identification requirement. In addition, as time proceeds, the trust/ACMC dispute with the Center will be resolved, insurance coverage and payment issues will be resolved, and other matters will be better identified. And the trust will have experience processing claims in the facility. That will enable the court to assess future funding requirements with more matters finalized and cer-

tain. That should benefit the claimants, the trust and New NGC.

Finally, in the event of an unfunded facility, the trust shall adopt streamlined claims procedures.

### Conclusion and Order

Based on the foregoing,

**IT IS ORDERED** that:

1. The motion to cancel the hearings on the alternate facility is **DENIED.**

2. The Legal Representative's motion to terminate the channeling order is carried on the court's docket. An alternate facility that does not obtain funding from New NGC will result in the trust having assets that would most likely allow a payment of only 4.1 to 6.5 percent of full settlement values that mirror the tort system. The court finds that the trust cannot resolve claims by paying only 4.1 to 6.5 percent of the value of the claim. Accordingly, the court holds that all remaining unknown and future claimants would have exhausted the remedy or remedies provided by the trust without first actually pursuing that payment. The motion will therefore be granted if New NGC does not transfer $144,581,078 to the trust by December 31, 2000. If New NGC does fund the trust in that amount by December 31, 2000, then the court will continue to carry the Legal Representative's motion on the court's docket. The court will determine future funding needs in two-year periods each September of every even number year and provide New NGC until the end of that year to continue funding the trust. If it does so, the court will continue to carry the motion. If it declines to fund, the court will grant the motion on January 1 of the next year for remaining unpaid asbestos disease trust beneficiaries.

3. The court adopts the alternate facility described in exhibit B. The facility shall include the settlement amounts established above, at pp. 199–200 and 213. The facility shall be modified to conform with the court's determinations in this

memorandum opinion. In the event that New NGC does not fund the trust by December 31, 2000, the trust shall revise the process to streamline and simplify the claims process and set a hearing on those proposed revisions to the facility no later than March 1, 2001. As modified to reflect the findings and conclusions in this memorandum opinion, the alternate facility of Exhibit B fulfills the remaining purpose of the plan's asbestos disease claims provisions, both if funded and if unfunded, as best as possible under the circumstances.

Counsel for the trust shall submit proposed orders as necessary to implement this memorandum opinion and order.

## EXHIBIT A TO MEMORANDUM OPINION

CENTER FOR CLAIMS RESOLUTION
PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT
ACMC GROUP BILLED CLAIMS SETTLED SINCE 1/1/1998
AS OF AUGUST 28, 2000

| | MESOTHELIOMA | | | LUNG CANCER | | | OTHER CANCER | | | NON-MALIGNANT | | | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | $ | AVG | # | $ | AVG | # | $ | AVG | # | $ | AVG | # | $ | AVG |
| SHIPYARD | 132 | $4,414,083 | 33,440.02 | 187 | $946,290 | 5,060.37 | 73 | $174,464 | 2,389.91 | 3,043 | $3,265,587 | 1,073.14 | 3,435 | $8,800,424 | 2,561.99 |
| INSULATOR | 173 | $4,144,755 | 23,958.12 | 590 | $3,079,005 | 5,218.65 | 204 | $456,677 | 2,238.61 | 9,308 | $8,252,125 | 886.56 | 10,275 | $15,932,562 | 1,550.61 |
| CONSTRUCTION | 76 | $6,941,006 | 91,329.03 | 168 | $3,689,846 | 21,963.36 | 36 | $256,878 | 7,135.50 | 1,875 | $4,763,178 | 2,540.36 | 2,155 | $15,650,908 | 7,262.60 |
| ALL OTHER | 110 | $5,623,740 | 51,124.90 | 543 | $3,154,143 | 5,808.73 | 312 | $923,418 | 2,959.67 | 17,056 | $20,012,255 | 1,173.32 | 18,021 | $29,713,556 | 1,648.83 |
| SPECIAL CLAIMS | 57 | $1,141,301 | 20,022.82 | 294 | $1,389,376 | 4,725.77 | 178 | $524,113 | 2,944.45 | 12,225 | $15,804,640 | 1,292.81 | 12,754 | $18,859,430 | 1,478.71 |
| TOTAL | 548 | $22,264,885 | 40,629.35 | 1,782 | $12,258,660 | 6,879.16 | 803 | $2,335,550 | 2,908.53 | 43,507 | $52,097,785 | 1,197.46 | 46,640 | $88,956,880 | 1,907.31 |

TRUST EXHIBIT

3

Privileged and Confidential

**EXHIBIT B TO MEMORANDUM OPINION**

**EXHIBIT IA WITH OR WITHOUT EXTERNAL FUNDING FROM NEW NGC**

**General Conditions Alternate Claims Facility (the "ACF") NGC Settlement Trust (the "Trust")**

**Asbestos Disease Claimants.**

Since bankruptcy law requires that the members of each class of creditors or claimants generally be treated equivalently, the Asbestos Disease Claims ("ADC") class of claimants must have similar treatment, i.e., each claimant in such class shall receive the same percentage of such claimant's claim as evaluated subject to the expedited review and claim payment procedure and substantially equivalent amounts under the individualized review and payment procedure discussed herein.

ADC claimants, who elect to file an ADC, may choose among the methods selected by the Trustees for the liquidation, payment and settlement of their claims such as: (1) an expedited review payment or (2) individual review and payment, subject to reserves or reductions necessary to ensure substantially equivalent treatment of all classes of claimants.

All ADC must be reviewed to ensure that each claim presents evidence of diagnosis of an asbestos-related condition resulting from exposure to NGC asbestos-containing products, which evidence would sustain a cause of action at law. Liquidated values for the claims will be based upon values established under the procedures set out herein. A claimant's right to a jury trial shall be maintained for the purposes of liquidating the value of the claim.

ADC will be processed as set out herein.

Asbestos Disease Claims Resolution Procedures (the "Procedures" or "ADCRP").

A. Purpose.

The purpose of the ADCRP is to provide fair payment to all persons with valid ADC for bodily injuries resulting from exposure to NGC asbestos-containing products, taking into account the basic principles of the tort system and the resources available to the Trust. Consistent with the anticipated number and amount of claims, the nature of the asbestos-related diseases, and the inherent characteristics of asbestos-related litigation, the Trust shall treat similar claims with similar circumstances as equivalently as possible.

The Trust shall make payments to valid claimants as funds become available and as ADC are liquidated, while maintaining sufficient resources to pay future valid ADC on a substantially equivalent basis. In order to assure substantially equivalent treatment of all claimants, the Trust may decide to have different forms and timing of payments to different claimants. Because such decisions must be based on estimates and cannot be done precisely, the estimates may have to be revised in the light of experience over time. A claimant who receives payment early in the life of the Trust may receive a smaller or larger percentage of the value of his claim than a claimant who receives payment in the middle of or late in the life of the Trust. However, the Trustees shall endeavor to treat all claimants as equivalently as possible consistent with their duties as trustees in these circumstances, given the practical limitations imposed by the inability to predict the future with precision.

Settlements shall be favored over all other forms of claim resolution, and the lowest feasible transaction costs shall be incurred in order to conserve resources and ensure funds to pay all valid ADC.

The General Principles and the Procedures set out herein are intended to provide additional general implementation instructions to which the Trustees have adhered in approving this Submission.

B. Notice and Claimant Payment Selection.

As soon as reasonably practicable, but no later than one year following the date these ACF implementing procedures are approved, the Trust shall mail claim filing information to each person or attorney for such person with an ADC (i) who filed a lawsuit naming Asbestos Claims Management Corporation ("ACMC") or the Trust or (ii) is known to have a pending claim or lawsuit naming ACMC. The claim form(s) used by the Trustees for such purposes shall be developed by the Trustees in a form substantially consistent with these Procedures. In the alternative, the Trustees may (i) accept forms submitted to other claims resolutions organizations or (ii) obtain claims information from electronic data bases maintained by such organizations provided that the information provided will permit the ADC to be evaluated under the medical and other criteria required herein. For any notice of an ADC subsequent to the effective date of these ADCRP, the Trust shall, within reasonable time after receipt of such notice, mail to the claimant the claim filing materials. Any claimant who fails to return an appropriate, completed claim information and payment selection form, which will be included in the claim materials, within twelve months from the date of mailing, shall have his claim disallowed unless the claimant is able to demonstrate to the satisfaction of the Trustees that the failure should be excused.

**General Principles for Asbestos Disease Claims Resolution.**

A. Determination of Payment Amounts.

Currently, there is substantial uncertainty regarding total assets and total liabilities that will determine the amount that claimants will receive from the Trust in the ACF. To ensure substantially equivalent treatment of all present and future claimants, the Trustees must determine, prior to making any distributions, the percentage of allowed liquidated value (the "ALV") that claimants would be likely to receive. No claimant shall receive payments that exceed the Trust's most recent determination of the percentage (the "Payment Percentage") of the full ALV that claimants would be likely to receive. The Trustees must base this determination of the Payment Percentage on (i) estimates of the number, types and values of present and future claims, (ii) the value of ACMC's known collectible assets, including its unresolved or unpaid insurance contracts, (iii) the Trust's expected future costs for administration and legal defense and (iv) other material matters that are reasonable and likely to leave sufficient funds to pay a comparable percentage of full tort system values to holders of present and future claims. The Trustees will reconsider this determination no less frequently than every two years to assure that it is based on accurate, current information. When making these determinations, the Trustees will exercise common sense and undertake a flexible evaluation of all relevant factors and shall not act in a rigid, restrictive manner based only on worst-case scenarios.

B. Payment of Valid Claims.

The Trustees shall audit, monitor and verify claims in accordance with these Procedures to ensure that payments are made only for valid claims.

C. Trustees' Discretion.

Notwithstanding any provision of these ADCRP to the contrary, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid claims so that payment of valid claims is not further impaired by such process. In issues related to the validity of claims, e.g., exposure and medical evidence, the Trustees shall have the latitude to make judgments regarding the amount of transaction costs to be expended so that ADC that are clearly valid are not further impaired by the costs of additional investigation. Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim notwithstanding the costs thereof Subject to the approval of the Supervising Court, the Trustees may amend these procedures from time-to-time to conform to generally suggested changes or advances in scientific or medical knowledge or other changes in circumstances.

D. Punitive Damages; Interest.

In determining the value of any claim, punitive damages shall not be considered or allowed, notwithstanding their availability in the tort system. ACMC and/or the Trust shall not pay pre-judgment interest, post-judgment interest, interest on deferred payments, nor any other type of interest on an ADC. [BI TAC objects—BI TAC would allow punitive damages and interest as permitted by state law.]

**Policies and Procedures for Filing An Asbestos Disease Claim ("ADC" or "Claim") With the NGC Settlement Trust Alternate Claims Facility**

1.0 **Election to File or Reject**

1.1 The Trustees shall:

1.11 Maintain a list of Scheduled Values for each disease category and

1.12 The ALV (defined below) to calculate the amount that might be paid to the holder of an allowed ADC and

1.2 Unless and until there is a final, non-appealable order lifting the Channeling Order as to all Unknown AD Claimants, Claimants may evaluate the maximum payment currently available and either:

1.21 File an ADC with the ACF, as detailed below, or

1.22 Elect to forgo, through an irrevocable rejection, the resolution of the ADC by the ACF.

Such rejection must clearly state that the AD Claimant has:

1.3 Given full consideration to:

1.31 The payment that might be available through the ACF, as calculated from information available as required by 1.1 above and

1.32 The inherent delays and impediments imposed by the tort system and

1.4 Elected to irrevocably forgo current or future rights to file an ADC with the ACF.

Such rejection may be filed with the Trust by use of the Rejection Form attached as Exhibit __ of these Procedures.

An AD Claimant who elects to forgo filing an ADC with the ACF by submitting the required Rejection Form, shall have met the burden imposed by the Channeling Order to exhaust his or her claim and shall be deemed to have no further available remedy to seek resolution through the Trust. The AD Claimants shall be free to move that the Channeling Order be lifted.

## 2.0 ADC Filing Methods

These procedures provide for the filing of an Expedited Review Claim ("ERC") or the filing of an Individualized Review Claim ("IRC"). The purposes of these filing methods are:

- *ERC Claims* —The expedited review claim election is designed primarily for claimants who easily can be determined by the Trust to have valid asbestos personal injury claims. Expedited review is intended to resolve claims on an expedited basis at a discount utilizing schedules based on historical settlements averages in the tort system. The program provides claimants, who so elect, a fixed and certain claims allowance made expeditiously. The ERC method allows claimants to elect a single discounted cash payment that will be paid rapidly and requires a somewhat less burdensome application process for pursuing claims than the individualized review process.

- *IRC Claims* —The individualized review provides a claimant with an individual consideration and evaluation of his or her claim. Individualized review is intended to resolve more difficult claims to be based on historical settlement averages in the tort system (the "Allowed Liquidated Value" or "ALV"). These allowances are expected to be greater than the ERC allowances. Because the detailed examination and individualized valuation of asbestos personal injury claims require greater time and effort, claimants electing individualized review will be processed and paid after ERC claims that are filed at the same time.

## 3.0 Processing of Claims

Claims will be processed, within each of the filing options, in the order in which the claim forms are received by the Trust and paid as follows:

- *ERC Claims* —Claimants electing expedited review will be reviewed and paid before claimants filing at the same time who elect individualized review. Expedited review is intended to result in discounted payment of claims based on allowances of qualifying claims utilizing schedules based on historical settlement averages in the tort system. Because ERC payments are certain, paid sooner and require a less burdensome application process, the amount of an ERC payment will be less than the expected amount of payments for similar claims filed for individualized review.

- *IRC Claims* —Valid IRC claims will be evaluated and allowed at settlement values based on or comparable to ACMC's historical settlement averages in the tort system, taking into account medical and exposure criteria, age of claimant, jurisdictional impact and other such relevant factors. Above average ALV's for each disease category will be paid only to those claimants who present credible evidence of the most severe combination of factors such as: the most serious injuries and damages within the disease category; definite, prolonged and predominant exposure to ACMC products; and a clear casual connection of injuries to asbestos exposure and to no other casual factors. Trustees may also take into account additional factors including, but not limited to, wage history and jurisdictional history.

In determining the Payment Percentage to be applied to the ALV's that are based on ACMC's historical settlement averages in the tort system, the Trustees will rely on expert advice with respect to the value of present and future claims against ACMC, the cost of claim processing, and the value of Trust assets, including funding commitments from New NGC. As with any attempt to forecast assets

and liabilities over a long period, there will be a substantial amount of uncertainty. In recognition of this uncertainty, the Trustees will update this estimate no less frequently than every two years and make periodic determinations as to the percentage of the ALV that can actually be paid to AD Claimants with allowed AD Claims. The projected liabilities include estimated ultimate claims liability and Trust expenses.

Trustees shall have the right to set the timing and schedule of payments for allowed IRC claims. Currently the Trustees expect that payments to AD Claimants will be made on a single-payment basis.

Exigent Claims. The Trust shall give priority in settlement treatment to exigent claims which include only those cases where the claimant's circumstances require priority resolution of the claim. Living claimants filing a mesothelioma claim shall automatically be treated as exigent claims.

Extraordinary Claims. To qualify for extraordinary claim treatment, a claim must meet certain negotiated criteria—a combination of age, number and age of dependents, relevant economic factors such as unusually high wage loss, evidence that no other factors such as use of tobacco contributed to the condition, evidence of an unusually high level of exposure to asbestos, or that the overwhelming majority of the claimant's asbestos exposure was to ACMC asbestos-containing products, and similar factors. The Trust shall make settlement offers to claimants having extraordinary claims giving due regard to all relevant factors including available Trust assets.

## 4.0 Settlement Offers

- *ERC Claims* —Valid ERC claims will be paid according to two fixed schedules: one schedule for individuals ex-posed to NGC asbestos-containing products while employed in the Construction Trades (building construction as opposed to highway, bridge or other forms), and another schedule for individuals exposed in all other occupations or venues. Payment will be made as soon as practicable after receipt and review of the completed claim forms and receipt of a fully executed release. Currently, these fixed discounted payment schedules are as follows:

| *Injury Claim* | Construction Trades | Other Occupations |
|---|---|---|
| *Mesothelioma* | TBD | TBD |
| *Lung Cancer* | TBD | TBD |
| *Other Cancer* | TBD | TBD |
| *Non–Malignant I.* | TBD | TBD |
| *Non–Malignant II.* | TBD | TBD |
| *Non–Malignant III.* | TBD | TBD |

- *IRC Claims* —The Trust will offer to liquidate the value of each individualized review claim, based on the ALV of other similar claims for the same injury. The ALV will be established to reflect historical tort system values and the amounts paid historically by ACMC as compensatory damages to resolve asbestos personal injury claims. Holders of allowed IRC Claims will be paid the ALV times the then current Payment Percentage.

To determine the appropriate ALV for an IRC claim, the Trust will look to the amounts historically paid by ACMC and the Trust to resolve claims with similar characteristics. This will be accomplished by statistically analyzing previously settled claims, and identifying claim characteristics that have historically correlated with settlement values. Clearly, the characteristics will be those that are currently used and have historically been used to determine the value of a claim in the tort system. The results of this analysis will be a set of standardized valuation rules to be used by the Trust to determine specific ALV's, based on the characteristics of the claim. In effect, the resulting rules

will be a multi-dimensional range of values based on claim characteristics that have historically influenced claim values. While the Trust will not have nor follow a published claim matrix, the claimant characteristics that will be considered in this analysis may include, but will not be limited to: confirmed injury, age, mortality status, number and age of dependents, years of asbestos exposure, job site of exposure, industry and occupation of exposure, disability/employment status, economic losses, jurisdiction, x-ray and diagnostic test findings, medical signs and symptoms, and smoking history.

Settlement offers shall not be made to claimants who do not meet the requirements of Section 8.0 below (the "Medical Criteria") or who otherwise do not have a compensable claim under applicable law. Any claimant whose ADC is disallowed for failure to meet the Medical Criteria or other requirements of these Procedures, but who nevertheless claims to have an asbestos-related disease that is compensable under tort law applying to his/her claim, shall be entitled, upon request, to submit such claim to binding or non-binding arbitration. Such arbitration shall be binding unless the claimant specifies otherwise. Arbitrators shall return awards establishing the ALV, if any, (i) only on proof that the claimant has an injury compensable under applicable law and (ii) in an amount no greater than the Scheduled Value of the applicable compensable disease category. If the claimant opts for non-binding arbitration and then rejects the award, such claimant shall be entitled to a jury trial and to payment of any verdict, pursuant to 5.0 of these Procedures.

With respect to any claimant whose claim does not meet the Medical Criteria at a given time and who receives no compensation from the Trust, but who later develops a condition that does meet the Medical Criteria and submits a claim for compensation under these Procedures, the Trust shall not reject such claimant's claim on the basis of the statute of limitations or any applicable doctrine concerning staleness of claims, so long as such claim would not have been time-barred as of the effective date of ACMC's withdrawal from the CCR (June 16, 2000) under the standards and burden of proof that would govern under applicable law. The Trust may reject any such claim submitted for compensation that was time-barred as of the effective date of ACMC's withdrawal from the CCR.

## 5.0 Releases

A claimant accepting an ERC or IRC offer to resolve a malignant disease claim must execute a full release of ACMC and the Trust consistent with applicable state law. A claimant accepting an ERC or IRC offer to resolve a non-malignant disease claim must execute a limited release of ACMC and the Trust. Any claimant who receives an ERC or IRC payment for a non-malignant asbestos injury may file a new asbestos personal injury claim in the ACF for an asbestos-related malignancy that is subsequently diagnosed. Any claimant who receives an IRC payment to resolve a Non–Malignant II or III claim may also file a new asbestos personal injury claim that may be allowed as a Non–Malignant I claim or Non–Malignant I or II claim, respectively. Any additional payments, to which such claimant may be entitled, shall be reduced by the amount of any prior ERC or IRC payment(s) to that AD Claimant. [NGC believes that releases should include NGC without regard to whether or not NGC funds; the other parties believe NGC should only be released if it funds the facility.] If the claimant elects not to file a claim with the ACF, as provided in Section in 1.0 above, no release will be executed.

## 6.0 Appeal or Review of Trust Evaluation of a Claim

If the ACF determines that the holder of an asbestos personal injury claim should not receive an ERC payment, that decision is not reviewable as against the Trust or ACMC. However, the claimant may then elect to file an IRC claim using the appropriate forms and procedures.

If an IRC claimant rejects the settlement offer of the ACF, the claimant may initiate mediation, non-binding arbitration or binding arbitration in accordance with procedures established by the Trustees.

Arbitrators will return awards within the range of disease category value limits set by the Trust for the disease category in which the claim properly falls, determine that the disease falls in a higher or lower category and determine an appropriate value or, in extraordinary cases, return awards in excess of category limits. If a claimant submits to arbitration and accepts the award, the award will establish the liquidated value of the claim and the claimant will receive payments in the same manner as one who had accepted the original valuation of the claim by the Trust.

Any lawsuit pending against ACMC or the Trust at the time that ACMC withdrew from membership in the Center for Claims Resolution shall be stayed, as to ACMC and the Trust, until the rejection of an arbitration award. [NGC believes if the channeling order lifts, the stay should lift as to the Trust as well.] Other claimants desiring to have their claim resolved, to the extent possible, by ACMC and the Trust, may file a lawsuit only after the rejection of an award from non-binding arbitration. The statute of limitations will be tolled from (i) June 16, 2000 until one year after the claim forms are distributed by the Trust to claimants or attorneys representing claimants with pending lawsuits or claims and (ii) the date a claim is filed with the Trust until 90 days after the claimant rejects the award in non-binding arbitration. The right to a jury trial shall be preserved with the defendant being ACMC. Venue, for ADC, shall be unchanged by the bankruptcy case. The law to be applied shall be either (a) the law of the state where the claimant has filed an asbestos disease lawsuit or, (b) in the event no such lawsuit has been filed, the law of the state with jurisdiction over such lawsuit. All claims and defenses that exist under the applicable law shall be available to both sides at trial. ACMC may waive any defense that would purport to establish that NGC was not liable for asbestos-related diseases caused by its asbestos-containing products. ACMC may concede product defect and that the product defect caused any asbestos-related injury and, in such case, the claimant shall be precluded from introducing any additional evidence on the product defect issue.

The award of an arbitrator or the recommendation of a mediator and the positions and admissions of the parties during compliance with alternative dispute resolution procedures shall not be admissible for any purpose at trial by any party or third party and are expressly determined not to be admissions by either party. If necessary, the Trustees may obtain an order from the U.S. District Court for the Northern District of Texas–Dallas Division incorporating an offer of judgment to liquidate the amount of the claim, scheduling discovery and trials in such a fashion as not to create an undue burden on ACMC or the Trust, or containing any other provisions in order to ensure that the Trust fulfills its obligations in accordance with the principles set forth herein.

A claimant who rejects the settlement offer of the Trust and an award in non-binding arbitration, elects to resort to the legal system and obtains a judgment for money damages shall have a claim with a liquidated value equal to the judgment. However, if judgment is entered against ACMC and/or the Trust, the Trust shall

not make any payment on account of such judgment for the first 5 years after entry of such judgment and shall pay the judgment at the then-applicable payment percentage in 5 equal installments, without interest, in years 6 through 10. The maximum aggregate payment by the Trust on the judgment, however, shall be limited to 3 times the Scheduled Value, adjusted by the Applicable Payment Percentage, for a claim in such disease category. Nothing herein contained shall limit the right of a claimant who obtains a judgment against the ACMC or the Trust from enforcing such judgment, in accordance with applicable state law, against any other party liable thereon.

## 7.0 Contribution Claims (Proposed)

Contribution Claims asserted against the Trust based upon theories of contribution or indemnification may not be processed or paid by the Trust unless and until the holder of such Claims (the "Contribution Claimant") establishes to the satisfaction of the Trustees that (a) the Contribution Claimant has paid in full the liability and obligations of the Trust to the direct claimant to whom the Trust would otherwise have had a liability or obligation under these Procedures, (b) the direct claimant and the Contribution Claimant have forever released the Trust from all liability to the direct Claimant and (c) no more than sixty (60) days shall have elapsed since the last payment by the Contribution Claimant. In no event shall any Contribution Claimant have any rights against the Trust superior to the rights of the related direct claimant against the Trust, including any rights with respect to the timing, amount or manner of payment. The Trust shall not pay any Contribution Claimant unless and until the Contribution Claimant's aggregate liability for the direct claimant's claim has been fixed, liquidated and paid by the Contribution Claimant pursuant to

a settlement (with an appropriate release in favor of the Trust) or a Final Order. In any case where the Contribution Claimant has satisfied the claim of a claimant against the Trust by way of a settlement, the Contribution Claimant shall obtain for the benefit of the Trust a release in form and substance satisfactory to the Trustees. The Trustees may develop and approve a separate proof of claim for asbestos personal injury Contribution Claims.

Contribution Claims which have not been disallowed, discharged or otherwise resolved by prior orders of the Court shall be processed in accordance with procedures to be developed and implemented by the Trustees, which procedures (a) shall determine the validity and allowability of such claims consistent with Section 502(e) of the Bankruptcy Code; (b) shall allow Contribution Claimants to select either binding arbitration or a Trustee conference or resort to the tort system for resolution of those specific disputes concerning disease categorization or other treatment of claims described elsewhere herein; and (c) shall otherwise provide the same processing and payment to the holders of such claims as the Trust would have afforded the holders of the underlying valid claims.

## 8.0 Initiating a Claim

- If a claimant is qualified and elects to file an ERC claim, he or she must file a complete *Expedited Review Claim Form (the "ERC Form")* and submit all supporting documentation required.
- If a claimant elects to file an IRC claim, he or she must file a complete *Individualized Review Claim Form (the "IRC Form")* and submit all supporting documentation required.

A claimant must submit the appropriate, fully completed Claim Form, including all supporting information required by the form or applicable instructions. Any Claim Form that is not ultimately completed, or is missing any of the requested

supporting information, will be disallowed by the Trust. Claimants need not retain attorneys to represent them or to submit claims.

## 9.0 Exposure Proof

The claimant must demonstrate exposure to asbestos or asbestos-containing products that were supplied or manufactured by the National Gypsum Company. This exposure could have occurred while the exposed person was engaged in carrying out job responsibilities or avocational pursuits or, in the case of a spouse or household member of a person having such exposure, as secondary exposure to such exposure. For all disease categories other than mesothelioma, the evidence of such exposure must be sufficient to show exposure to the asbestos or asbestos-containing product on a regular basis over some extended period of time in proximity to where the exposed person actually worked, or an equivalent exposure secondary to occupational or avocational exposure.

To demonstrate exposure to a National Gypsum asbestos-containing products the claim filing should:

- Specify the occupation and describe the job duties or otherwise describe the circumstances that led to exposure to NGC asbestos-containing products.
- In the case of occupational exposure, describe the industry where exposed, and how the asbestos product was used in this industry, at each specific exposure site.
- In the case of occupational exposure, specify the employer(s) or job site(s) where exposure occurred.
- In the case of occupational exposure, specify the time period employed at each specific job site.
- Specify the nature of the injured person's exposure to NGC products (e.g., the frequency of exposure, the duration of exposure, whether exposure

was from working directly with the product, working in the area where the product was handled, working in the area where the product was present, either visible or hidden from view).

The Trust may request supporting documentation from any claimant, and such claimant shall supply such documentation to the extent it is within his or her possession or control.

## 10.0 Medical Proof

The claimant, to meet the medical criteria required for an allowed claim, must:

- Provide a medical report from a Qualified Physician diagnosing an asbestos-related injury and additional proof, dependent upon the injury alleged.
- Document that at least 10 years elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis of an asbestos-related injury.
- Depending upon the asbestos-related disease alleged, meet the requirements listed for that disease.

*Mesothelioma:*

Mesothelioma means a(i) diagnosis by a Qualified Physician referencing pathological findings of a board certified pathologist of a malignant tumor caused or contributed to by exposure to asbestos originating in the mesothelia cells of the pleura, peritoneum or like tissue or (ii) reasonable equivalent clinical diagnosis by a Qualified Physician in the absence of adequate tissue for pathological diagnosis.

*Lung Cancer:*

A. Diagnosis by a Qualified Physician of a malignant primary bronchogenic tumor of any cell type caused or contributed to by exposure to asbestos.

B. To qualify for compensation under this category, a claimant must demonstrate the existence of primary asbestos-related cancer of the lung

and provide evidence related to one of the following criteria:

1. Demonstration by medical report of the existence of one of the following:

 a. Bilateral interstitial lung disease,

 b. Unilateral pleural disease (plaques or thickening) of at least ILO Grade B in the absence of any other clinical explanation or bilateral pleural disease (thickening or plaques), or

 c. Pathological evidence of asbestos; or

2. Demonstration of at least fifteen (15) years of [NGC would insert "heavy" here] occupational [BI TAC would remove "occupational" here] exposure to asbestos-containing materials in employment regularly requiring work in the immediate area of visible dust.

*Other Cancer:*

A. Diagnosis by a Qualified Physician of a malignant primary tumor of the colon, larynx, esophagus, pharynx, stomach or rectum caused or contributed to by exposure to asbestos; and

B. Demonstration by a clinical or pathological medical report that meets the criteria for Non–Malignant I or Non–Malignant II.

*Non–Malignant I:*

Qualification as a Non–Malignant I allowed claim requires a diagnosis of a bilateral [BI TAC objects to the insertion of "bilateral" here] Non–Malignant I qualifying disease by a Qualified Physician based on one of the following:

A. Asbestosis I–A diagnosis requires one of the following:

 1. In the case of a deceased claimant, a diagnosis by or referencing a finding of a physician who is board certified in the field of pulmonology or pathology that an asbestos-related disease was a substantial contributing cause of death.

 2. In the case of either a living or deceased claimant, a diagnosis requiring:

 a. A certified B-reader report [BI TAC would add "or report from a Qualified Physician"] of chest x-rays showing small irregular opacities of ILO Grade 2/1 or greater; and

 b. Pulmonary function testing that shows evidence of lung capacity of 70% or less based on acceptable measurements of Forced Vital Capacity ("FVC") or Total Lung Capacity ("TLC").

B. Asbestosis I–B diagnosis requires one of the following minimum objective criteria:

 1. A certified B-reader report [BI TAC would add "or report from a Qualified Physician"] of chest x-rays showing small irregular opacities of ILO Grade 1/0; and

 Pulmonary function testing that shows one of the following:

 a. FVC < 80% of predicted with FEV1/FVC ≥ 72% (actual value) [65% if ≥ 68 years old]; or

 b. TLC < 80% of predicted; or

 c. FEV1/FVC ≥ 72% (actual value) [65% if ≥ 68 years old] with DLCO < 76% of predicted; or

 d. FVC ≥ 80% of predicted with bilateral basilar crackles, in the absence of any other clinical explanation.

 2. A statement by a board-certified pathologist that more than one representative section of lung tissue otherwise uninvolved with any other process (e.g., cancer or emphysema) demonstrates bilateral interstitial fibrosis or a pattern of

peribronchiolar or parenchymal scarring in the presence of characteristic asbestos bodies.

C. Diffuse Pleural Thickening I requires:

1. A certified B-reader report [BI TAC would add "or report from a Qualified Physician"] of chest x-rays showing small irregular opacities of ILO Grade B–2 or C–1 or higher; and

2. Pulmonary function testing that shows one of the following:

a. FVC < 80% of predicted with FEV1/FVC ≥ 72% (actual value) [65% if ≥ 68 years old]; or

b. TLC < 80% of predicted.

*Non–Malignant II:*

Qualification as a Non–Malignant II allowed claim requires a diagnosis of a bilateral [BI TAC objects to the insertion of "bilateral" here] Non–Malignant II qualifying disease by a Qualified Physician based on one of the following:

A. Asbestosis II requires a certified B-reader report [BI TAC would add "or report from a Qualified Physician"] of chest x-rays showing small irregular opacities of ILO Grade 1/0 for a claimant who does not meet the pulmonary function testing requirement of Asbestosis I.

B. Pleural Thickening II requires a certified B-reader report [BI TAC would add "or report from a Qualified Physician"] of chest x-rays of ILO Grade B–2 or C–1 or higher for a claimant who does not meet the pulmonary function testing requirement of Pleural Thickening I.

*Non–Malignant III:*

Qualification as a Non–Malignant III allowed claim requires a diagnosis of a bilateral [BI TAC objects to the insertion of "bilateral" here] Non–Malignant III qualifying disease [NGC would replace "disease" with "condition"] by a Qualified Physician based on a certified B-reader report that demonstrates one of the following:

A. Fibrosis III requires a certified B-reader report [BI TAC would add "or report from a Qualified Physician"] of chest x-rays that demonstrates an asbestos-caused abnormality that is less than ILO Grade 1/0; or

B. Pleural Changes III requires documentation of bilateral pleural disease [NGC would replace "disease" with "condition"] (plaques or thickening) diagnosed on the basis of x-ray, CT scan, HRCT scan or pathological evidence.

[BI TAC would combine Non–Malignant II and Non–Malignant III into a single category.]

Alternatively, the ACF will also accept for consideration the disease determination of other asbestos claims resolution organizations.

## 11.0 Auditing, Monitoring and Verifying

The Trust will conduct random and other audits to verify information submitted in connection with claims. The Trust, in accordance with provisions of the Trust Agreement, will develop methods for auditing information about exposure to asbestos products and the reliability of medical evidence. The standard for such audits by the Trust shall include a requirement that all medical evidence used in making determinations of disease comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable. These audits may require the submission of additional information, if reasonably available, such as x-ray films or pulmonary function test tracings, and may include independent readings of x-rays, tissue samples, laboratory tests, and pulmonary function tests.

In the event that an audit reveals that invalid information has been provided to the Trust, the Trustees may penalize any claimant or claimant's attorney by disallowing the ADC or seeking sanctions from the U.S. District Court for the Northern District of Texas–Dallas Division as the Trustees deem to be necessary, including the requirement of payment by the offending source to offset the costs associated with the audit and any future audit(s), reordering the priority of payment of ADC's, raising the level of scrutiny of additional information submitted for the same source(s), or prosecuting the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152. The Trustees may also, after audit, refuse to accept medical evidence from certain doctors or facilities.

The Trust shall consult with the BI TAC and the Legal Representative with regard to audit procedures and, failing consent, shall have the right to institute such procedures in the absence of a Court order to the contrary.

## 12.0 Confidentiality

Submissions with respect to Claims asserted in the ACF shall be deemed to be part of a settlement discussion and be kept confidential and shall not be admissible or discoverable in any court proceeding not directly related to Claims submitted under these Procedures. [NGC objects and would permit release of information to NGC.]

## 13.0 Required Information

All claimants will be required to submit a Claim Form to the Trust as well as other supporting documentation. Information requirements for an ERC filing will constitute a subset of the Information required for an IRC filing. The information required for the filing of an IRC may include the following:

- *Injured Party Information:*
 Full Name
 Social Security Number
 Gender
 Date of Birth
 Is injured party living
 If injured party is living and not represented by counsel:
 Mailing Address
 Daytime Phone
 If injured party is deceased:
 Date of Death
 Was death asbestos-related
 If injured party has a personal representative other than, or in addition to, his/her attorney:
 Name
 Social Security Number
 Mailing Address
 Daytime Phone
 Relationship to Injured Party
- *If claimant is represented by counsel:*
 Attorney Name
 Paralegal or Contact Name
 Name of Law Firm
 Firm Address (Street, City, State, Zip)
 Attorney Phone
 Attorney Fax
 Attorney E–Mail Address
 Law Firm Contact Phone
 Law Firm Contact Fax
 Law Firm Contact E-mail
- *Diagnosed Asbestos–Related Injuries:*
 For all injuries that have been or were diagnosed for the injured party and for which medical documentation is submitted:
 Diagnosis by a Qualified Physician
 Date of Diagnosis
 Copies of reports, if available, of lung function tests, x-ray readings and pathology results as provided by the diagnosing Qualified Physician
- *Dependents and Beneficiaries:*

For any other person(s) who may have rights associated with this claim (including all spouses and dependents):

Full Name

Date of Birth

Relationship

Financially Dependent

- *Occupational Exposure to NGC Products:*

For each site, industry or occupation in which claimant alleges exposure to asbestos:

Date Exposure Began

Date Exposure Ended

Occupation

Employee of National Gypsum Company

Description of Job Duties

Industry in which exposure occurred

Description of how and why asbestos products were used at the site

Employer

Site or Location of exposure

Plant or Site Name

Location at plant or site where exposure occurred (City and State)

Description of how injured party was exposed to NGC product(s)

Name of NGC product(s) to which injured party was exposed

- *Exposure to an Occupationally Exposed Person:*

If the claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member: (Occupationally exposed person information must be completed in addition to the following)

Date Exposure to Other Person Began

Date Exposure to Other Person Ended

Relationship to occupationally exposed individual

Description of how injured party was exposed to the person or NGC product(s)

- *Smoking/Tobacco History:*

For each type of tobacco product the injured party has smoked or used:

Tobacco Product (cigarette, cigar, pipe)

Date Began

Date Ended

- *Asbestos Litigation:*

If a lawsuit has ever been filed on behalf of the injured party:

State in which the suit was originally filed

Name of court in which suit was originally filed

Date on which the suit was originally filed

Was NGC or the NGC Trust a named defendant in the suit

Whether the injured party received settlement money from NGC, the NGC Trust, Asbestos Claims Management Corporation, or Huron Cement

Aggregate settlement amount received from all defendants to date

Current status of this suit

If this suit has been dismissed or has received a judgment:

Date of Verdict

Name of Defendant(s)

Verdict Amount

- *Workers' Compensation/Other Disability Claims:*

If the injured party ever received disability benefits related to asbestos:

Name of organization granting benefits

Date benefits began

Monthly benefit stipend

Name of company claim was filed against

- *Employment Information:*

Current Employment Status

Amount of last annual wage

Date of last wage received

- *In addition to the above information, claimants will be required to provide supporting documentation in the form of:*

Death Certificate (if claimant deceased)

Certificate of Official Capacity (if personal representative is filing form)

Medical Records supporting the diagnosis of alleged injuries

Supplemental medical documentation from another trust(s) (discretionary)

Proof of NGC product exposure supporting the alleged exposure

W–2 and first page of Form 1040 for last year of full employment (if lost wages are being claimed)

Social security or other employment records

## 14.0 Definitions

1. Average Value shall mean the values initially set by the Trustees based on historical settlement averages in the tort system and updated periodically to reflect the experience of the Trust.

2. "Basilar Crackles," sometimes called "rales," shall mean those sounds described in American Thoracic Society, "The Diagnosis of Nonmalignant Diseases Related to Asbestos," 134 *American Review of Respiratory Disease,* 363, 366 (1986), and shall be observed in accordance with the criteria set forth therein.

3. "Board-certified Pathologist" shall mean a physician currently licensed to practice medicine in the District of Columbia or in one or more U.S. states or territories and who currently holds primary certification in anatomic pathology, or combined anatomic and clinical pathology, from the American Board of Pathology, and whose professional practice is principally in the field of pathology and involves regular evaluation of pathological materials obtained from surgical and post-mortem specimens.

4. "Certified B-reader" shall mean an individual who has successfully completed the x-ray interpretation course sponsored by the National Institute of Occupational Safety and Health (NIOSH), and show NIOSH-certification is up-to-date.

5. "Chest X-rays" shall mean radiographs taken in four views (Posterior–Anterior, Lateral, and Left and Right Obliques) within one year of the date that the Claim is submitted to the NGC Settlement Trust (or within one year of death, if the Exposed Person is deceased), and graded quality 1 for reading according to the criteria established by the ILO; provided, however, that in situations where the Claimant is unable to provide quality 1 chest x-rays because of death or because of an inability to have new chest x-rays taken, then in those situations only, chest x-rays graded quality 2 will be acceptable.

6. "ILO Grade" shall mean the radiological ratings for the presence of lung changes by chest x-rays as established from time to time by the International Labour Office (ILO), and as currently set forth in "Guidelines for the Use of ILO International Classification of Radiographs of Pneumoconiosis" (1980).

7. "Latency Period" shall mean the period from the date of the exposed person's first significant exposure to asbestos or asbestos-containing product to earlier of the date of diagnosis or death.

8. "Predicted Values" for spirometry and lung volumes shall be those published by Morris, *Clinical Pulmonary Function Testing,* 2d Edition, Intermountain Thoracic Society (1984), or others that are substan-

tially equivalent. Each subject must be tested with and without inhaled bronchodilators, with best values taken. "Predicted Values" for diffusing capacity shall be those published by *Miller, et al.*, 127 *American Review of Respiratory Disease*, 170–77 (1983), or others that shall be corrected for race, ethnic origin, or other substantially equivalent criteria. Predicted Values for any pulmonary function testing shall take into account other relevant factors, as appropriate.

9. "Primary" refers to the place the cancer originated. For example, if a cancer begins in the liver and metastasizes to the lung, this would not be considered a primary lung cancer case related to asbestos exposure. However, if the cancer began in the lung and spread to other organs, it is a primary asbestos-related lung cancer. If there is any indication that the original site was not the relevant organ, or if there if a dispute as to where the primary site was, this may prevent the case from being categorized as a compensable cancer.

10. "Pulmonary Function Testing" shall mean spirometry, lung column, and diffusing capacity ("DLCO") testing that (a) has been performed at an accredited hospital or (b) substantially conforms to quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment which substantially meets ATS standards for technical quality and calibration, all as set forth in 20 C.F.R. 718.103 and Appendix B thereto or in the ATS guidelines in 144 *American Review of Respirato-*

*ry Disease* 1202–18 (1991). All back-up data pertaining to Pulmonary Function Testing of an Exposed Person may be examined to ensure that these quality criteria and standards have been satisfied.

11. "Qualified Physician" shall mean a physician, who is certified in one of the relevant specialties by the relevant medical specialty board to make diagnosis or other medical judgment for certain types of asbestos-related diseases, all as listed below:

a. Internist—American Board of Internal Medicine—cancer or non-malignant diseases or conditions [NGC objects to the inclusion of internists without an appropriate subspecialty.]

b. Oncologist—American Board of Internal Medicine with a subspecialty of medical oncology—cancer

c. Pathologist—American Board of Pathology—cancer or non-malignant diseases or conditions

d. Pulmonary Specialist—American Board of Internal Medicine with a subspecialty of pulmonary disease—cancer or non-malignant diseases or conditions

e. Radiologist—American Board of Radiology—cancer or non-malignant diseases or conditions

An Osteopath with an equivalent subspecialty and Certification shall be acceptable as a Qualified Physician. [NGC objects to the inclusion of Osteopaths without an appropriate subspecialty.]

[BI TAC would further include occupational physicians or any claimant's treating or personal physicians as Qualified Physicians.]

INITIAL PAYMENT PERCENTAGE NGC SETTLEMENT TRUST

4%

SCHEDULED VALUES NGC SETTLEMENT TRUST

| Disease | Scheduled Values | Maximum Values | Calculated Payment @ Initial Payment Percentage | |
|---|---|---|---|---|
| | | | Scheduled Payment | Maximum Payment |
| Mesothelioma | $ 40,000 | $ 80,000 | $ 1,600 | $ 3,200 |
| Lung Cancer | $ 7,000 | $ 14,000 | $ 280 | $ 560 |
| Other Cancer | $ 3,000 | $ 6,000 | $ 120 | $ 240 |
| Non–Malignant | $ 1,200 | $ 2,400 | $ 48 | $ 96 |

**REJECTION FORM**
**NGC SETTLEMENT TRUST**

Claimant Information:

Name _____ SSN: _____

Address _____ DoB: _____

_____

(City) (State) (Zip Code)

Diagnosed ____ Mesothelioma ____ Lung Cancer ____ Other Cancer

Disease: ____ Non–Malignant Disease

Counsel Information:

Attorney _____ Telephone #: _____

Firm _____ Fax #: _____

Address _____

_____

(City) (State) (Zip Code)

Contact, if other than attorney _____

- I have read the Alternate Claims Facility ("ACF") Procedures of the NGC Settlement Trust (the "Trust").
- I have received the Scheduled Values and the current Payment Percentage that would be used to calculate the payment that might be available to me if I filed a claim with the ACF.
- I am aware of the possible payment from the Trust for my claim if allowed.
- I am aware of the length of time from filing to allowance for a claim filed with the ACF.
- I am aware that the ACF allows me to proceed to arbitration if I am unsatisfied with the Scheduled Value offered to me by the ACF or the maximum arbitration award that I could receive if I were to proceed to, and prevail in, arbitration.
- I have considered my options if I decide not to file a claim with the ACF and elect to sign this Rejection Form.
- I understand that by signing this Rejection Form, I irrevocably elect to forgo any options I may have for resolution of my claims through the ACF and hereby reject any payment amount that is currently available through the ACF.
- Check one:
 - _____ I am represented by counsel specified above and have fully discussed my option with such counsel.
 - _____ I am not represented by counsel, but fully understand the options I have under the ACF Procedures of the Trust.

As evidenced by my signature below, I elect to reject any payment amount that is currently available through the ACF and irrevocably elect to forgo filing a claim with the ACF of the Trust.

Signature of Claimant: _____

Print or Type: _____ Date: _____

If the attorney of record for Claimant, only as listed above, has power of attorney to make such decisions, such attorney may sign for the Claimant.

Signature of Attorney: _____

Print or Type: _____ Date: _____

Certification:
1. By Notary Public or
2. Attorney of Record, if signed by Claimant